Raymond HICKS

v.

VENNERBECK & CLASE COMPANY.

No. 85–82–M.P.

Supreme Court of Rhode Island.

May 5, 1987.

Barry J. Kusinitz, Temkin & Miller Ltd., Providence, Van L. Hayhow, James M. Lewis P.C., Attleboro, for plaintiff.

Robert J. Quigley, Higgins, Cavanagh & Conley, Providence, for defendant.

## OPINION

WEISBERGER, Justice.

This workers' compensation case comes before us on the employee's petition for certiorari to review a final decree of the appellate commission reversing the trial commissioner's order to pay compensation for a continuing period of total incapacity and ordering instead payment for a closed period. The facts pertinent to the employee's petition are as follows.

As of April 1982, Vennerbeck & Clase Company (Vennerbeck), had employed Raymond Hicks for one year as a "flat stock worker." In this job Hicks processed various types of metals for use as jewelry stock, flattening metal bars in a roll mill and washing the pieces in tanks of sulfuric acid. When Hicks reported to work on the morning of April 19, 1982, he discovered that the plant was temporarily closed because fumes, escaping from the sulfuric-acid tanks, permeated the plant. While Hicks and his coworkers waited outside, firefighters wearing oxygen tanks and masks ventilated the plant with large fans. One and a half hours later, the workers were permitted to enter the plant. Following instructions, Hicks delayed performing his usual duties for two hours while he cleaned his roll mill to remove a residue of sulfuric acid that had settled out from the

fumes. From midmorning until lunch and then again after lunch, Hicks worked at the sulfuric-acid tanks, washing the stock. Just before lunch Hicks noted a feeling of lightheadedness and experienced a slight headache and throat irritation. By two o'clock in the afternoon, the headache and throat irritation increased to the point that Hicks notified his foreman that he was unable to complete the shift. Returning home, Hicks went to bed immediately. At two o'clock in the morning he awakened, perspiring profusely and experiencing severe chest pains and a numbness in his right arm.

The next day, despite a severe burning sensation that radiated from his throat to his chest, Hicks reported to work and completed the shift. That night, however, the burning sensation intensified, causing Hicks to seek medical attention at his local hospital. After a brief evaluation, emergency room personnel referred Hicks to an ear, nose, and throat specialist, Dr. Charles Faber, who on the basis of a laryngoscopic examination immediately instituted a treatment regime for contact laryngitis. When the prescribed treatment failed to alleviate the burning sensations and the throat irritation, the specialist consulted with a medical internist, Dr. Richard Robin, and scheduled further diagnostic procedures designed to identify varying disorders of the throat.

Interpreting, in light of Hicks's subjective complaints, a routine electrocardiogram that had been performed to document Hicks's cardiac status before submitting him to the more stressful of the diagnostic procedures scheduled, the medical internist formed the opinion that Hicks may have recently suffered a myocardial infarction. Canceling the scheduled procedure as too stressful for a possible heart patient, the internist admitted Hicks to the hospital on April 27, 1982, for diagnosis and treatment of the suspected heart attack. During this five-week hospitalization and for a number of months following the hospitalization, Hicks remained under the care of the throat specialist. Also during this initial hospitalization Hicks was evaluated by a cardiologist, Dr. Jack Klie, who together with the internist treated him after the hospitalization for suspected cardiac problems. In addition to this continuing out-patient care, Hicks was readmitted to the hospital on September 8, 1982, for a ten-day period to evaluate a severe episode of chest pain.

Between the two hospitalizations, Hicks filed on June 15, 1982, an original petition with the Workers' Compensation Commission, seeking disability, medical, and dependency benefits on the ground that his personal injuries, namely tracheobronchitis and myocardial infarction, occurred as the result of his inhalation of the sulfuric-acid fumes that permeated Vennerbeck's plant on April 19, 1982. The trial commissioner conducted hearings on the petition on four days spread over the course of several months.

Testifying on the first day of the hearing, Hicks recounted his work assignment and the events at the plant the morning that the fumes escaped. He testified that upon entering the plant that morning, he found the atmosphere hot and heavy with the odor of sulfuric acid. After describing the chest pains and numbness that wakened him the first night after the sulfuric-acid incident, Hicks testified that he had never before experienced those sensations. On cross-examination Hicks stated that he continued to experience intermittent chest pains, that he experienced numbness whenever he lifted his arms over his head, and that he believed that it was his heart condition rather than his throat ailment that prevented his return to work.

Although the throat specialist did not testify, letters summarizing his evaluation and treatment of Hicks were admitted into evidence. In the letters, the throat specialist stated that he had diagnosed Hicks's throat irritation as acute contact laryngitis directly caused by the inhalation of sulfuric-acid fumes. He further stated that as of June 4, 1982, all symptomatology of a laryngeal disorder had resolved and consequently any disability related to the laryngitis should have also resolved. Cautioning that he was not a cardiologist, he opined that a stressful event, such as expo-

sure to a marked volume of toxic fumes, could trigger a myocardial infarction in a person who is predisposed to cardiovascular disease. Beyond this generalization, the throat specialist did not render a professional opinion concerning Hicks's cardiac status.

Testifying on the second day of the hearing, the medical internist stated that Hicks was discharged after the April hospitalization with the diagnosis of acute myocardial infarction and tracheobronchitis. He further testified that at that time he was of the opinion that exposure to the sulfuric-acid fumes triggered the cardiac disorder and rendered Hicks totally disabled. The internist stated that after Hicks's second hospitalization, he formed the opinion that Hicks had an underlying coronary-artery disease that caused intermittent chest pain by restricting the flow of blood to the heart. He stated that this coronary insufficiency and the second hospitalization "seemed to be related" to the sulfuric-acid incident because the incident could have aggravated the underlying coronary-artery disease, assuming the disease pre-existed the incident. Citing coronary-artery disease as the cause, the internist testified that Hicks remained totally disabled through the second hospitalization to January 17, 1983, the date of the internist's last evaluation before testifying. On cross-examination the internist acknowledged that his specialty was internal medicine, not cardiology; that he could only state with a reasonable degree of medical certainty that, in his opinion, Hicks had sustained a recent myocardial infarction at the time of the April hospitalization, but that he could not state with any certainty when the infarction actually occurred; and that although he assumed that Hicks suffered from coronary-artery disease at the time of the sulfuric-acid incident, he could not render an opinion concerning the possible existence of that condition before his first examination of Hicks on April 27, 1982.

Testifying on behalf of Hicks on the third day of the hearing, the cardiologist offered his opinion that it was possible, but not certain, that Hicks sustained a myocardial infarction triggered by the inhalation of the sulfuric-acid fumes permeating Vennerbeck's plant on April 19, 1982. He also stated that he was of the opinion that as of January 24, 1983, Hicks remained totally disabled because he continued to experience chest pain upon exertion.

On the final day of the hearing the cardiologist testified again, stating that he had altered his initial assessment of Hicks's medical status on the basis of a cardiac catheterization that he performed on Hicks subsequent to his previous testimony. Explaining that a catheterization is a definitive procedure that provides a visualization of the internal workings of the patient's heart, the cardiologist testified that after performing Hicks's catheterization he formed the opinion, with a reasonable degree of medical certainty, that Hicks had never suffered a myocardial infarction, nor did he have any significant coronary-artery disease. Accordingly, the cardiologist was also of the opinion that the inhalation of the sulfuric-acid fumes did not cause Hicks to experience pain through any mechanism involving the heart and that Hicks's chest pains were of unknown etiology. The cardiologist further concluded that as of February 8, 1982, the date of the catheterization, Hicks was fully capable of resuming performance of his prior duties with Vennerbeck.

Permitted to testify as a rebuttal witness after the cardiologist's testimony, Hicks stated that he continued to experience chest pain and consequently remained disabled for work. To support his claim of disability, he described an attempt to undertake light janitorial duties that failed during the first day of employment because of chest pain.

The trial commissioner rendered an opinion on May 19, 1984, and entered a decree on May 31, 1984, finding that the inhalation of sulfuric-acid fumes totally incapacitated Hicks for work as of April 21, 1982, and continuing. He also found that Hicks had sustained contact laryngitis as a work-related injury. Noting in the opinion that Hicks had not experienced chest pains before the sulfuric-acid incident, the trial commissioner stated that although the car-

diologist discounted any causal connection between the incident and Hicks's chest pain, sufficient evidence was submitted to support a reasonable inference that the chest pain flowed from the inhalation of the fumes.

The appellate commission rendered an opinion on January 22, 1985, and entered a decree on January 30, 1985, reversing the trial commissioner's finding of continuing incapacity. Noting in the opinion that contact laryngitis was the only work-related injury specifically found by the trial commissioner and that the throat specialist testified that any disability related to the laryngitis was resolved by June 4, 1982, the appellate commission stated that the medical evidence introduced through the internist and cardiologist was insufficient to establish that any alleged disability occurring after June 4 was causally related to the contact laryngitis.

In arguing that the appellate commission erred in reversing the trial commissioner's finding of continuing incapacity, Hicks asserts that the commissioner's finding was based entirely upon an acceptance of Hicks's rebuttal testimony that, regardless of the medical diagnosis, he continued to experience incapacitating chest pain. According to Hicks, the acceptance of his rebuttal testimony involved an assessment of his credibility. Citing *Davol, Inc. v. Aguiar*, 463 A.2d 170 (R.I.1983), for the proposition that in reviewing findings flowing from an assessment of credibility the appellate commission may not independently weigh the evidence unless it first determines that the trial commissioner was clearly wrong or misconceived or overlooked material evidence, Hicks contends that the appellate commission failed to apply the appropriate standard of review. Hicks further argues that under the principles enunciated in *Valente v. Bourne Mills*, 77 R.I. 274, 75 A.2d 191 (1950), when, as he contends here, an unbreakable linkage exists between employment and injury, the trial commissioner is not required to reject the employee's testimony simply because it contradicts medical testimony. In advancing these arguments, Hicks misconceives the basis of the appellate commis-

sion's findings and erroneously presumes that a causal relationship exists between the sulfuric-acid incident and his chest pain.

■■■ Normally when considering an appeal from a trial commissioner's decree, the appellate commission conducts in essence a de novo review, examining and weighing the evidence, drawing its own conclusions, making its own findings of fact, and ultimately deciding whether the evidence preponderates in favor of or against the findings embodied in the decree. *E.g., Bottiglieri v. Caldarone*, 486 A.2d 1085, 1087 (R.I.1985); *Moretti v. Turin, Inc.*, 112 R.I. 220, 223, 308 A.2d 500, 502 (1973); *Wardwell Braiding Machine Co. v. Imondi*, 107 R.I. 19, 22, 264 A.2d 317, 319 (1970). Absent fraud, the findings of the appellate commission will not be disturbed by this court so long as legally competent evidence exists in the record to support the findings. *E.g., Quintana v. Worcester Textile Co.*, 511 A.2d 294, 295 (R.I.1986); *Monticelli v. Trifari, Krussman & Fishel, Inc.*, 495 A.2d 994, 996 (R.I.1985); *State v. Hurley*, 490 A.2d 979, 983 (R.I.1985). However, as Hicks points out, we have held that even though the commission may conduct a de novo review, it must find, before rejecting findings based on credibility determinations, that the trial commissioner was clearly wrong either because the commissioner obviously erred in judging the credibility of the witnesses or overlooked or misconceived material evidence in arriving at the credibility determination. *E.g., Mulcahey v. New England Newspapers, Inc.*, 488 A.2d 681, 683 (R.I.1985); *Davol, Inc. v. Aguiar*, 463 A.2d at 174; *Laganiere v. Bonte Spinning Co.*, 103 R.I. 191, 197, 236 A.2d 256, 259 (1967). In that instance our standard of review includes a determination of whether the appellate commission applied the appropriate standard for its review.

■■■ In reversing the trial commissioner's finding of continuing incapacity, the appellate commission did not reject the testimony of any witness as unworthy of belief and hence was not required, as Hicks contends, to find that the trial commission-

er clearly erred in assessing the credibility of witnesses or overlooked or misconceived material evidence. Rather the commission reviewed the evidence anew, affording full credibility to all witnesses, and found that it failed to rise to the quantum of proof required as a matter of law to establish a causal relationship between the sulfuric-acid incident and any alleged disability extending beyond the resolution of the clearly related laryngitis on June 4, 1982. The sole question before us therefore is whether the record can support this finding.

■ It is well settled that the employee is burdened with proving a causal connection between the alleged disability and the employment. *E.g., LaRose v. State Institute of Mental Health,* 504 A.2d 472, 473 (R.I.1986); *Gaines v. Senior Citizens Trans., Inc.,* 471 A.2d 1357, 1358 (R.I.1984); *Natale v. Frito-Lay, Inc.,* 119 R.I. 713, 716, 382 A.2d 1313, 1314–15 (1978). The connection may be established by proving that the conditions and the nature of employment contributed to the disability. *Mulcahey,* 488 A.2d at 684. In the great majority of cases, the question of whether the employment contributed to the employee's disabling physical condition is complex and will require the presentation of medical testimony for its resolution. *Valente v. Bourne Mills,* 77 R.I. at 278–79, 75 A.2d at 194. When testifying to a causal connection between employment and disability, or the lack thereof, a medical expert must speak of "probabilities" rather than "possibilities." *E.g., Lovitt Foods, Inc. v. Veiga,* 492 A.2d 1237, 1238 (R.I.1985); *Coletta v. Leviton Manufacturing Co.,* 437 A.2d 1380, 1383 (R.I.1981); *Woods v. Safeway System, Inc.,* 101 R.I. 343, 346, 223 A.2d 347, 349 (1966).

■ It is true, as Hicks notes, that when lay testimony is admitted in addition to medical testimony on the issue of a nexus between employment and disability, the lay testimony need not be rejected automatically if it contradicts the medical testimony but may be given whatever probative force the factfinder determines. *Albert Zabbo & Sons, Inc. v. Zabbo,* 122 R.I. 79, 82, 404 A.2d 487, 488 (1979). This is not to say,

however, that lay testimony may be substituted for medical testimony when the question of a causal connection is of such a nature as to demand expert testimony. *See Donahue v. Washburn Wire Co.,* 492 A.2d 152, 153 (R.I.1985) (testimony offered by employee that contradicted medical testimony concerning healing of scar tissue excluded because recovery from skin-graft surgery is technical issue calling for specific medical testimony).

■ As Hicks also notes, circumstances exist in which a causal connection may be proved without medical testimony. *See McCaughey v. Geigy Chemical Corp.,* 116 R.I. 672, 677, 360 A.2d 561, 564 (1976); *Valente,* 77 R.I. at 279, 75 A.2d at 194. This court has, however, carefully delineated those circumstances: when a physical injury appears reasonably soon after an accident with symptoms observable to the ordinary person in that part of the body where force was applied, a natural inference arises, in the absence of credible testimony to the contrary, that the injury resulted from the employment. *Valente,* 77 R.I. at 279, 75 A.2d at 194.

■ Viewing the evidence adduced at trial, in the light of the foregoing principles, we are of the opinion that the record supports the commission's award of total disability for a period ending June 4, 1982. The letters of the ear, nose, and throat specialist, stating that the inhalation of sulfuric-acid fumes directly caused a totally disabling laryngitis lasting until June 4, 1982, were not disputed and support closing the period of disability on that date. We agree with the commission that the remaining medical testimony lacked the degree of precision required as a matter of law to prove a causal connection between Hicks's chest pain and the sulfuric-acid incident. The internist could not, with any certainty, place the myocardial infarction he believed Hicks sustained within a time frame following, rather than preceding, the incident. Nor did he speak of "probabilities" when offering his opinion that Hicks suffered an aggravation of an underlying coronary-artery disease; rather he spoke only of a seeming relationship based on the

presumption that the disease pre-existed the incident. In contrast, the cardiologist's testimony, offered with a reasonable degree of medical certainty, was competent evidence of the lack of a causal connection between Hicks's chest pain and the incident. Furthermore, the appellate commission did not err in looking exclusively to medical testimony for proof of a causal connection. Hicks's rebuttal testimony, even if afforded full credibility and though establishing a contemporaneous experience of chest pain, is insufficient as a matter of law to raise the inference that inhalation of the fumes caused and continues to cause chest pain. This is not a situation where, as in *Valente*, an object or work condition injures a bodily part in a manner perceptible to any lay observer. Here, the determination of what, if any, effect the fumes had upon Hicks's internal anatomy and physiology is a technical determination calling for specific medical testimony.

For the foregoing reasons Hicks's petition for certiorari is denied and the decree of the appellate commission is affirmed. The writ heretofore issued is quashed. The papers in this case may be remanded to the Workers' Compensation Commission.