853 P.2d 737

**Frank M. GARCIA, Claimant–Appellee,**

v.

**BORDEN, INC., and Cigna Insurance, Respondents–Appellants.**

**No. 13661.**

Court of Appeals of New Mexico.

March 29, 1993.

Harold O. Atencio, Butt, Thornton & Baehr, P.C., Albuquerque, for respondents-appellants.

David C. Chavez, Chavez & Chavez, Los Lunas, for claimant-appellee.

## OPINION

DONNELLY, Judge.

Employer and its insurance company appeal a compensation order of the Workers' Compensation Judge (WCJ) awarding temporary total disability benefits and attorneys' fees to Worker. We discuss whether: (1) expert testimony was required to establish that Worker's accident arose from a risk related to his employment; (2) the decision of the WCJ that Worker suffered a disability due to a work-related accident is supported by substantial evidence; (3) it was error to admit rebuttal testimony concerning the cause of Worker's accident; and (4) the WCJ erred in determining that Worker was temporarily totally disabled. We affirm.

## FACTS

Worker was employed as a cheese worker for Employer. His work included, among other things, cleaning pipes and equipment and cooking, processing, and packing cottage cheese. He also was directed to use chlorine to sanitize lines connected to the cheese processing equipment. On March 19, 1991, Worker began work and thereafter began experiencing dizziness while applying sanitation chemicals to the equipment. When the dizziness continued to affect him, Worker decided to go to the employees' locker room and rest with a wet towel over his head. He testified that when he reached into his locker for a towel he was still experiencing the effects of the chlorine, and that he became dizzy and fell, hitting his lower back on the locker door. When he fell to the floor, he heard a pop and felt a pain in his back; thereafter, he experienced tingling and numbness in his legs. He rested for a while and then returned to work. He was told to continue working and to seek medical treatment the next day. Worker was treated for back pain and was given a medical excuse from work for several weeks. When he was released to return to work, he was told his job as a cheese worker was no longer available. Instead, Employer offered him a job doing clean-up work, earning the same salary. Worker refused this job because he was still physically disabled and the new position required more strenuous activity than he could perform. Thereafter, Worker filed a compensation claim; following a hearing the WCJ awarded him temporary total disability benefits, medical benefits, and attorneys' fees.

## I. RISK INCIDENT TO EMPLOYMENT

■ Employer denies that Worker suffered a job-related injury or that Worker's testimony was sufficient to establish that the alleged accident arose out of and in the course of his employment. Employer argues that the WCJ erred in granting an award of compensation because Worker failed to establish by expert testimony that his injury was caused by an accident which arose out of a risk of his employment.

■ To establish a right to workers' compensation benefits, Worker must prove that he suffered a compensable injury arising out of and in the course of his employment. NMSA 1978, § 52–1–28(A) (Repl.Pamp.1991). For an injury to "arise out of" the employment, there must be a showing that the injury was caused by a risk to which a worker was subject by reason of his employment, and the employ-

ment must contribute something to the hazard which gave rise to the injury. *Adamchek v. Gemm Enters., Inc.*, 96 N.M. 24, 26, 627 P.2d 866, 868 (1981); *Gutierrez v. Artesia Pub. Sch.*, 92 N.M. 112, 115, 583 P.2d 476, 479 (Ct.App.1978).

Worker testified that the dizziness he experienced from chlorine was the cause of his fall. Employer disputed this contention and points to testimony of Worker which indicated that his dizziness resulted from bronchitis, and that Worker also testified that he reinjured his back subsequent to March 19, 1991. Whether Worker's back injury occurred during his employment and the cause of Worker's dizziness precipitating his fall were the subject of conflicting testimony. On direct examination, Worker testified that his back injury occurred while working on March 19, 1991. On rebuttal, he testified that chlorine he was using that morning to clean the cheese processing equipment made him dizzy prior to his fall. He stated that his supervisor had given him a paper informing about the chemicals he was required to use. Worker also testified that he had been using chlorine to sanitize equipment for about two weeks prior to his fall, and that chlorine can make you dizzy, "I don't know if it makes other people dizzy, but it made me dizzy." Employer contends that lay testimony was insufficient to establish that Worker's fall was caused by a risk incident to his employment, and that expert testimony was required to show that his exposure to chlorine while at work caused him to become dizzy and fall.

Employer advances two arguments in support of this contention. First, Employer raises a statutory ground; it asserts that Section 52–1–28 requires expert testimony to establish that chlorine actually caused Worker's dizziness and fall in light of Employer's express denial that a connection existed between Worker's accident and a risk of his employment. We disagree with this reading of the statute. Section 52–1–28(B) provides in applicable part: "In all cases where the employer ... den[ies] that an alleged disability is a natural and direct result of the accident, the worker must establish that causal connection as a probability by expert testimony of a health care provider...." We do not interpret the statute as requiring expert medical testimony to establish the cause of Worker's fall under the circumstances presented here. Instead, we think Employer's contention regarding the necessity of expert testimony concerning the cause of Worker's fall more properly is a challenge to the weight of the evidence he presented, not its admissibility. *See Hansen v. Skate Ranch, Inc.*, 97 N.M. 486, 491, 641 P.2d 517, 522 (Ct.App.1982).

■ The language of Section 52–1–28(B) indicates that proof of causation by a health care provider is required to establish a connection between a worker's injury and disability where the employer denies that the disability resulted from a worker's accident; it does not, however, require expert testimony to establish the cause of the worker's accident. This aspect of proof may be established by either expert or lay testimony. A court will not read into a statute language that is not contained therein, particularly if the statute makes sense as written. *See Perez v. Health & Social Servs.*, 91 N.M. 334, 336, 573 P.2d 689, 691 (Ct.App.1977), *cert. denied*, 91 N.M. 491, 576 P.2d 297 (1978).

Second, Employer argues that even if the statute does not mandate the use of expert testimony to establish that Worker's contact with chlorine caused his dizziness and fall, the connection between Worker's employment and his claimed injury in the instant case involved facts which were of such a technical nature that expert testimony was required under Section 52–1–28 to prove the claimed fact. Additionally, Employer argues that expert medical testimony is required to be presented where a worker suffers two successive accidents in order to establish the extent of a worker's disability resulting from each accident, and the causal connection, if any, between the two accidents.

We understand Employer's arguments here to be that Worker's resulting dizziness constituted a separate accident apart from the accident which occurred shortly

thereafter resulting in his fall in the locker room. Employer argues that Worker failed to present expert medical testimony showing the nexus between the two falls. In advancing these arguments, Employer points out that Worker's initial testimony indicated that he was not certain why he became dizzy at work. On cross-examination, Employer elicited testimony from Worker indicating that Worker's dizziness was caused by bronchitis. During Worker's case in rebuttal, however, he testified that he became dizzy while using chlorine to sanitize the cheese processing equipment. He also testified that he had been working with chlorine at the plant for the previous two weeks and that the chlorine had made him dizzy.

■■■ Employer is correct that opinion testimony of lay witnesses is generally confined to matters which are within the common knowledge and experience of an average person. *See Young v. Burke*, 139 Colo. 305, 338 P.2d 284, 285 (1959) (en banc); *see also* SCRA 1986, 11–701. However, subject to the trial court's discretion, testimony concerning the personal perception of a lay witness may be given where the witness's opinion might be helpful to the fact finder in resolving a material issue. *See Russell v. Russell*, 101 N.M. 648, 649, 687 P.2d 83, 84 (1984); *see also Pavlos v. Albuquerque Nat'l Bank*, 82 N.M. 759, 761, 487 P.2d 187, 189 (Ct.App.1971); *see generally* 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 701[02] (1992). Under the record herein, we find no error in the WCJ's admission of Worker's testimony. SCRA 11–701 permits a lay witness to state an opinion if the trial court determines that the opinion is "rationally based on the perception of the witness and [is] helpful to a clear understanding of his testimony or the determination of [the] fact[s] in issue." *See Hansen*, 97 N.M. at 491, 641 P.2d at 522 (lay witness may testify as to his opinion based on personal perceptions); *Jesko v. Stauffer Chem. Co.*, 89 N.M. 786, 788, 558 P.2d 55, 57 (Ct.App.1976) (testimony of lay witness is admissible under Evidence Rule 701 where the opinion is rationally based on his own perceptions and is helpful in determi-

nation of basis for damage); *see generally* 31A Am.Jur.2d *Expert and Opinion Evidence* § 31, at 42–43 (1989).

Nor do we believe that the out-of-state statutory authority relied upon by Employer is persuasive regarding this issue. We have reviewed each of the out-of-state cases cited by Employer and conclude that these decisions principally turn upon the issue of whether the claimants presented expert testimony to establish the link between the claimants' alleged disability and their exposure to certain toxic substances. Additionally, we do not find *Tate v. Workmen's Comp. Appeal Bd.*, 8 Pa.Cmwlth. 392, 302 A.2d 862 (1973), cited by Employer, applicable to the present case. In *Tate* the court considered the question of whether a worker's earlier fall at work caused a subsequent fatal fall away from the work place. On appeal the Pennsylvania court held that there could be no recovery in the absence of a showing that the cause of the second accident, which occurred approximately one month later, was related to a disability which arose from the first accident. The court found there was no conclusive evidence that the first accident was compensable, and that there was no conclusive evidence that the second accident was causally related to the first one. The result reached in *Tate* is principally fact related and the court noted that the claimants failed to prove that the worker struck his head in the first fall, causing a compensable head injury, and the claimants failed to prove the existing accidental injury was the proximate cause of the worker's subsequent accident. In contrast, here, the WCJ found, based upon substantial evidence, that Worker proved his claim. We think the evidence supports this result.

Worker in the present case testified regarding his reaction to exposure resulting from his use of chlorine which was being used to clean equipment. He also stated that the chlorine caused him to become dizzy, that this dizziness continued, causing his fall a few minutes later in the locker room. We think that Worker's testimony was sufficient to explain the cause of his fall and that the WCJ could reasonably

determine from this evidence that Worker's fall arose from a risk related to his employment. Although we agree with Employer that the effect of chlorine upon an individual is a matter that may properly be presented by expert testimony, the WCJ did not err in permitting Worker to testify concerning his own personal reaction following his use of chlorine during his work and that his resulting dizziness was the cause of his fall. *Cf. Olsen v. Winter Park Racquet Club*, 142 So.2d 5, 8 (Fla.1962) (chlorine can cause dizziness); *Sparacino v. Andover Controls Corp.*, 227 Ill.App.3d 980, 169 Ill.Dec. 944, 592 N.E.2d 431, 433 (1992) (chlorine is noxious substance and can cause bronchial damage).

Similarly, we think Employer's reliance on *Luvaul v. A. Ray Barker Motor Co.*, 72 N.M. 447, 384 P.2d 885 (1963), is not dispositive here. In *Luvaul* the worker presented expert testimony regarding the effects of carbon monoxide fumes on people. Nevertheless, the trial court found that the worker had dizzy spells for many years prior to his injury and that he failed to prove that his fall arose out of his employment or a risk reasonably incident to his employment. *Id.* at 452, 384 P.2d at 888. The issue there, as here, was whether there was substantial evidence to support the result. In *Luvaul* our Supreme Court determined that the trial court's ruling denying the worker's claim was supported by substantial evidence. We do not read *Luvaul* as requiring expert testimony to prove the causal connection between a worker's accident and his or her employment under the circumstances here presented.

## II.  *SUFFICIENCY OF EVIDENCE*

█ Worker testified that prior to his accident he had been using chlorine at the plant for about two weeks. On the morning of March 19, 1991, Worker stated he was using chlorine, that he had been provided with written information by Employer concerning chlorine, and that "it was just bad for you, it starts burning your chest and if it gets on your skin it will burn your skin and started getting me dizzy." Worker also stated that when he went into

the locker room he was still having the same effects from dizziness that he had experienced in the cheese room.

█ Employer contends that even if Worker is not required to present expert testimony concerning the cause of his dizziness and fall, nevertheless, there was insufficient evidence to support a finding that his accident arose out of a risk incident to his employment, and that the WCJ improperly assumed that Worker's exposure to chlorine would cause dizziness. Employer also asserts that Worker's testimony concerning the reason for his fall was contradictory in nature. Our standard of review in workers' compensation cases is upon the whole record. *Tallman v. ABF (Arkansas Best Freight)*, 108 N.M. 124, 127–28, 767 P.2d 363, 366–67 (Ct.App.), *cert. denied*, 109 N.M. 33, 781 P.2d 305 (1988). Under this standard of review, we consider all the evidence, both favorable and unfavorable, presented to the WCJ and determine whether there is substantial evidence to support the result. *Id.* This review does not, however, allow this Court to weigh the credibility of such testimony. *Id.*

As shown by the record, the initial testimony of Worker was that he did not know what made him dizzy; however, upon further questioning, he stated that the chlorine made him dizzy. It was for the WCJ to weigh the credibility of Worker's testimony. *Tapia v. Panhandle Steel Erectors Co.*, 78 N.M. 86, 89, 428 P.2d 625, 628 (1967). Simply because Worker's testimony was inconsistent or contradictory in part does not require that such testimony be disregarded. The WCJ heard Worker's testimony, observed his demeanor, and determined that his statement that he was required to use chlorine in cleaning the equipment, that the chlorine caused him to become dizzy and prompted his loss of balance and fall, was credible. *Cf. Andrus v. Gas Co.*, 110 N.M. 593, 596–97, 798 P.2d 194, 197–98 (Ct.App.) (sufficient evidence supported finding that Gas Company's acts caused homeowner's carbon monoxide poisoning), *cert. denied*, 110 N.M. 260, 794 P.2d 734 (1990). Based on this testimony

and the reasonable inferences arising therefrom, the WCJ could reasonably find that Worker's injury arose out of and in the course of his employment and was a risk of his employment. *See Ensley v. Grace,* 76 N.M. 691, 695, 417 P.2d 885, 887 (1966) (proof that accident arose out of and in the course of the worker's employment may be established by reasonable inferences drawn from proven facts). Worker's testimony was sufficient evidence to support the finding.

### III. *ADMISSION OF REBUTTAL TESTIMONY*

■ Employer also argues that Worker should not have been allowed to testify on rebuttal regarding the fact that on the morning of the accident, he was using chlorine to sanitize cheese processing equipment and the chlorine had made him dizzy.

■ The admission of rebuttal testimony is within the WCJ's discretion. *See El Paso Elec. Co. v. Real Estate Mart, Inc.,* 98 N.M. 570, 573, 651 P.2d 105, 108 (Ct.App.), *certs. denied,* 98 N.M. 478, 649 P.2d 1391, *and* 98 N.M. 590, 651 P.2d 636 (1982). Absent a showing of abuse, the trial court's ruling permitting the introduction of rebuttal evidence will not be reversed on appeal. *See Carle v. McChord Credit Union,* 65 Wash.App. 93, 827 P.2d 1070, 1081 (1992); *see also El Paso Elec. Co.,* 98 N.M. at 573, 651 P.2d at 108. Employer contends that Worker's rebuttal testimony was simply an attempt to introduce new evidence unrelated to Employer's case-in-chief. We disagree. During cross-examination, Employer elicited testimony relating to the cause of Worker's dizziness, and indicated it was solely due to his bronchitis. On rebuttal, Worker testified regarding the fact that chlorine was used in the plant for cleaning purposes and that its use made him dizzy. We find no abuse of discretion in the WCJ's ruling allowing Worker to testify during rebuttal regarding the use of chemicals in the plant and their effect upon Worker leading to his accident.

### IV. *AWARD OF DISABILITY*

■ Finally, Employer argues that Worker was not entitled to temporary total disability benefits because he was offered work at his pre-injury wage before he reached maximum medical improvement. NMSA 1978, Section 52–1–25.1(B) (Repl.Pamp.1991), states that "[i]f, prior to the date of maximum medical improvement, an injured worker's health care provider releases the worker to return to work and the employer offers work at the worker's pre-injury wage, the worker is not entitled to temporary total disability benefits." Here, Employer claims that because it offered work at his pre-injury wage, Worker was not entitled to disability benefits. Worker responds that the work offered was more strenuous and entailed more lifting than his pre-injury work; thus, he was justified in declining such position. Worker also notes that Employer did not offer any other position to him.

■ In construing a statute, this Court seeks to ascertain and give effect to the intent of the legislature. *Giant Indus. Ariz., Inc. v. Taxation & Revenue Dep't,* 110 N.M. 442, 445, 796 P.2d 1138, 1141 (Ct.App.1990). When the legislature revised the Workers' Compensation Act in 1987, it declared its policy and intent "to be that every person who suffers a compensable injury ... should be provided with the opportunity to return to gainful employment as soon as possible with minimal dependence on compensation awards." NMSA 1978, § 52–1–26(A) (Repl.Pamp.1991).

The purpose of temporary total disability benefits is to provide compensation to a worker who is unable to perform his job duties until such time as he attains maximum medical improvement; that is, when further recovery from or lasting improvement to an injury can no longer be reasonably anticipated. *See* § 52–1–25.1(A). These benefits are temporary, and once a worker reaches maximum medical improvement, a percentage of permanent disability can be determined. *See* § 52–1–26. If a worker can return to work and earn the same wage he was earning prior to his

injury, there is no reason for him to receive temporary disability benefits.

We think it is implicit in the language of Section 52-1-26 that the legislature intended that where a worker is given a release to return to work, the release anticipates that the worker return to the type of work he was doing prior to the accident or work which he or she is otherwise physically capable of performing. *Cf. Sanchez v. Molycorp, Inc.*, 113 N.M. 375, 379-80, 826 P.2d 971, 975-76 (Ct.App.1992). If the work involves duties which are more strenuous than those involved in his prior work assignment, as in this case, and Worker's back remains injured, the new duties must involve work he is capable of performing. We do not read the statute to mean that Employer can offer any work that has the same pre-injury wage, and thereby make Worker ineligible to receive disability benefits, even though Worker is unable to perform the work. Such interpretation would produce a result contrary to the general purpose of the Act. *Cf. Gonzales v. Lovington Pub. Sch.*, 109 N.M. 365, 370, 785 P.2d 276, 281 (Ct.App.1989) (court will not interpret statute in manner that produces absurd result), *cert. denied*, 109 N.M. 262, 784 P.2d 1005 (1990).

We think it is clear that if Employer reassigns Worker to different duties following a release to return to work, it must be work that Worker is capable of performing. Here, there was evidence that the new job position offered to Worker was more strenuous and entailed more lifting, standing, climbing, and bending than that involved in Worker's pre-injury job. Evidence was also presented that Worker could not perform such work. There was no evidence that when Worker was released the physician who issued the release considered any other work assignment than that which Worker had performed at the time of his initial injury. The decision of the WCJ determining that Worker was entitled to total temporary disability benefits even though he was offered work at this pre-injury wage is supported by substantial evidence.

## CONCLUSION

The order awarding compensation benefits is affirmed. Worker is awarded $1,500 for the services of his attorney on appeal.

IT IS SO ORDERED.

MINZNER, C.J., concurs.

HARTZ, J., dissents.

HARTZ, Judge (dissenting).

The parties and the majority opinion assume that whether Worker can recover benefits depends upon whether he adequately established that his dizziness at work was caused by exposure to chlorine. Starting from that assumption, I conclude that Worker cannot recover. Also, I question the propriety of permitting Worker to testify about chlorine on rebuttal.

## I. CAUSATION

It is not at all clear to me that the Workers' Compensation Judge (WCJ) found that Worker's dizziness was caused by exposure to chlorine at work. Yet even if he had, the record cannot support such a finding. Worker was not qualified to express an opinion that his dizziness was caused by chlorine. Nothing in the record indicates that the WCJ possessed special expertise to draw the necessary inference. The gaps in the evidence cannot be filled by judicial notice. And the evidence regarding Worker's exposure to chlorine is so vague that any inference that chlorine caused his dizziness would be rank speculation. Although I do not rely on NMSA 1978, 52-1-28(B) (Repl.Pamp.1991)—the majority appears to be correct in ruling that the statute does not apply to the causal relationship at issue in this case—the history of that provision suggests that it was adopted by the legislature precisely to prevent the type of fallacious reasoning condoned in this case.

To begin with, I will summarize the pertinent evidence in the record. The first mention of chlorine in the case was during Worker's testimony in rebuttal. No medical record, accident report, deposition, or memorandum in the record refers to chlorine. On direct examination in his case-in-chief, Worker described his activities as a

cheese operator, his job position on the date of his accident:

A. I'd go in and I'd drain the cheese with its water. I'd open the cheese. That's our—about 1700 pounds of cheese in a vat. I'd open the cheese—a lot of strain is bending and lifting and getting it prepared to run, setting up the lines. After I'd set up the lines, I'd sanitize the lines. I'd cream and I'd pump the cheese over to—

. . . .

Q. When you say sanitize the line, did that involve any lifting or bending?

A. Again, lifting and bending.

Q. How much were you lifting and how often were you bending?

A. I was bending the full time I was there and lifting half the time that I was there.

Q. And when you sanitize these lines, what does that require, you to pick up lines and hoses?

A. Connect lines together and shoot it with iodine, bending and reaching up.

. . . .

A. The lines are the tubing that the cheese goes through to the machine. They're pipes. I'd set up the pipes to the machine. Iodine, we call them lines, but the pipes, we'd iodine the pipes. We'd have everything ready. We'd pump the cheese through the pipes to the machine. And sometimes the pipe would be loose and you would have to tighten it. Reach up to tighten it. And once the machine is filled up with the stuff that it needed, it stopped, and you'd get ready to run it, you check everything.

He also testified to other physical duties, such as lifting boxes and bending over the vat to shovel cheese to the sides. He said that he handled about four vats of cheese a day.

Worker testified that on the day of the accident he punched in at about 9:00 a.m. and went to the cheese room. He continued:

A. And I started getting dizzy about 9:10, real dizzy. So I decided to go to the lab to get a glass of water. So I went to the lab and got a glass of water, drank my water, and returned back to the cheese room. And I started work for about another 10 to 15 minutes, and I got dizzy again. So—my head was hurting, so I decided to go to the lab and get an aspirin. So I got an aspirin. I returned back to work. As soon as I was almost done with that vat that I was opening, I got real dizzy, real, real dizzy. So I decided to take a break and go to the locker room and put a towel over my head.

Q. Was there anyone in the cheese room with you during this time?

A. Yes. Larry Allray.

Q. And what happened?

A. I told Larry Allray I was sick and that go take a break and I was going to go to the locker room.

Worker said that he went to the locker room, where he became very dizzy and fell, injuring his back. He then sat on a chair for approximately 10 minutes before returning back to work "dizzy with my back hurting." When his supervisor, Doug Grimes, came to work about 10:00 a.m., he reported the accident to Grimes. Grimes told him to keep working and Worker "finished out the day." Worker said that he told Grimes at the end of the day that his back was hurting.

The next day, a Wednesday, Worker sought medical attention. The physician's assistant who saw him noted three complaints: (1) "knuckles on right hand started swelling after using screwdriver two days ago, but denied trauma;" (2) "also complained of cough, congestion and fatigue;" and (3) "back pain over past two to three days, has had to increase lifting at work." The physician's assistant diagnosed him as having bronchitis and prescribed an antibiotic. He was excused from work for the rest of the week.

Worker testified that on Monday, March 25, "I returned back to work about 5:30 [a.m.], still with my backache real bad hurting, bronchitis, and I went to do my daily job again into the cheese room. I started opening the cheese again, and started hyperventilating." Other employees tried to assist Worker in the company office, but

they had to take him to an emergency room for treatment, apparently some time between 8:00 and 9:00 a.m.

Employer suggested that Worker's dizziness resulted from physical exertion while suffering from bronchitis. The following exchange occurred during cross-examination of Worker:

Q. Mr. Garcia, in your direct examination, you stated that when you were in the locker room and you fell, you fell because you got dizzy, right?

A. Yes.

Q. You were dizzy because of your bronchitis, right?

A. I don't know. I guess so.

Q. You had been sick with bronchitis recently?

A. Yes.

Q. And you were dizzy and you had been having shortness of breath?

A. Not shortness of breath.

Q. But the dizziness?

A. Yes.

Q. Okay. Is there any reason that you know of for this dizziness, other than the bronchitis?

A. No, I don't.

Worker's wife testified that Worker had no medical problems when he went to work on March 19.

When Worker rested his case, Employer's attorney moved for a "directed verdict," contending that there was no evidence that Worker's dizziness was work-related. He argued:

If he could show that the dizziness was connected to fumes in the cheese room, for instance, then he would have a case. But he has not got any shred of medical testimony saying that there's any fumes in that cheese room that caused his dizziness. The only thing we have is bronchitis. Therefore, based on that, he has not met his burden of proof to his case-in-chief, and I am entitled to a directed verdict because there is no risk arising out of the employment that has been established.

The WCJ denied the motion without explanation.

Employer called as a witness Steven Walden, a company manager. On cross-examination Worker's attorney questioned him about fumes in the cheese room:

Q. Have you ever worked in the cheese room?

A. That's where I started 10 years ago.

Q. Isn't it true that the, there's a lot there, a heavy fume in there, smells heavy, isn't that correct, smells like cheese?

A. Smells like—like a dairy smells like a dairy, smells like milk products.

Q. Isn't it true that sometimes people get sick while working in that cheese room?

A. It could happen.

Q. Just because the smell is so strong, isn't that correct?

A. Not from the dairy products, I wouldn't think. Not myself, anyway.

Q. Not yourself, but isn't it true that because that strong smell and the fumes in the air?

A. I have never heard of anyone being sick in that plant because of a milk smell. Chemical smells, but not from dairy smells.

Q. All right. Isn't it true there is chemicals being used in that cheese room, in the processing room?

A. Yes.

Q. Isn't it true that those chemical smells can get people sick, and have gotten people sick at Borden?

A. If they were not handled properly, yes.

On redirect, Employer's attorney asked, "Do you know if anyone has ever just been doing their job in the cheese room and has gotten dizzy and fainted from the fumes in the cheese room?" Walden answered, "Not to my knowledge."

Walden's testimony ended the first day of trial. The proceedings were then continued for thirteen days. When the trial resumed, the first witness was Worker, called by his attorney as a rebuttal witness. Over objection by Employer that the testimony was improper rebuttal, Worker testi-

fied about his use of chlorine on the day of his accident. Omitting withdrawn questions, attorney colloquy, and testimony to which objection was sustained, Worker's testimony was as follows:

Q. [Y]ou heard the testimony of Steve Walden.

A. Yes.

Q. Concerning chemical uses and fumes within the plant.

A. Yes.

Q. My question to you ... did you use any chemicals on 3–19–1991?

A. Yes, I did. We switched over from chlorine to iodine because we were getting coli. So we were sanitizing the lines.

Q. With what?

A. With chlorine.

Q. So you were using what chemical on 3–19–91?

A. I was using chlorine.

Q. And had you used that chemical that morning?

A. Yes.

Q. Describe to the court what type of chemicals you had used that particular day.

A. I had used chlorine.

Q. How long had you been using this type of chlorine?

A. About two weeks.

Q. And were you familiar with that particular chemical?

A. Yes.

Q. How were you familiar with it?

A. They give you a sheet on all the chemicals and what they can do to you.

Q. What was your understanding of the content of or the concentrate of this chlorine?

A. It was all chlorine.

Q. And describe to the court the manner in which you used this particular chemical on 3–19–1991.

A. Okay. I was using an airhose to sanitize the pipes with chlorine because we had been getting coli and that had been getting all over me due to the coli.

Q. What had been getting all over you?

A. [A supervisor] had gotten all over me yelling at me about the coli.

Q. What is coli?

A. It's a bacteria that's found in the cheese through incubation, and you get coli, you have to sanitize not to get it. And if you get it, it goes into the, into a record that goes to Lubbock, I think. [Court overrules objection that witness is testifying as an expert chemist and is not qualified to testify on the subject.]

Q. What was the effect of this, of the use of this chemical?

A. When I was iodining with the chlorine, I—it's just bad for you. It starts burning your chest, and if it gets on your skin, it will burn your skin, and it started getting me dizzy after I had started using it for two weeks.

Q. And had it gotten you dizzy on 3–19–1991?

A. Yes.

Q. And was that at what time?

A. Approximately 9:20.

Q. That's the time you testified to previously?

A. Yes. 20, 9.

Q. When you went to your locker room, were you still having these same effects of dizziness as you experienced in the cheese room?

A. Yes.

### CROSS EXAMINATION

Q. [Y]ou said you are familiar with different chemicals that you were using?

A. They give us a list on the chemicals we use so we know how to use them.

Q. And those kind of chemicals are the type of chemicals that can make a person dizzy, you're familiar with that?

A. It can make a person sick.

Q. And dizzy?

A. Or you are supposed to use iodine, though, to sanitize, but she got all over me and she told me to use chlorine, so I used chlorine.

Q. But you just testified that you got dizzy, is that right?

A. Due to the chlorine.

Q. So the chlorine is the one that can make a person dizzy, then?

A. I'm not an expert, like you said.

Q. You don't know whether that can make you dizzy or not?

A. It could, it can.

Q. It can make a person dizzy?

A. Yes.

Q. And you know that chlorine makes people dizzy?

A. I guess.

Q. Well, does it, does chlorine—

A. It made me dizzy. I don't know if it makes other people dizzy, but it made me dizzy.

Q. How long had you been working in this cheese room?

A. I think about two years.

Q. Had the chlorine made you dizzy before?

A. I told you I didn't use any for two weeks. We started using it two weeks.

Q. So it's only been for the two-week period—

A. Yes, because they were getting coli.

Q. Did you say Larry Allray was a co-worker of yours in the cheese room?

A. He worked there, yes.

Q. He didn't get dizzy, though, did he?

A. He wasn't there when I—I come in and I get the lines ready. That's my job.

Q. Now, remember when I was conducting my cross-examination in your case-in-chief, I asked you, Are you familiar—Do you have any other reason why you might have been getting dizzy, other than bronchitis? And you said, No. Do you remember that?

A. I didn't know I had bronchitis at the time. No, I don't remember.

This Court could affirm a finding by the WCJ regarding the causal connection between Worker's dizziness and his use of chlorine if the finding is based on either (1) expert opinion testimony, (2) the WCJ's own special expertise, (3) matters subject to judicial notice, or (4) proper inferences from the circumstances surrounding Work-

er's dizziness. I will consider each possibility.

No expert testimony supports the causal connection. The only witness to testify to that connection was Worker. Worker, however, did not possess any special knowledge, training, experience, or education that would qualify him to express an opinion on the relationship between the chemical he was using and his dizziness. *See* SCRA 1986, 11–702 (rule of evidence regarding qualification of witness as an expert). Although he stated that he had read a warning sheet accompanying the chemical, he did not testify that the warning mentioned dizziness or even breathing problems. Indeed, he testified that he did not know whether the chemical he was using caused dizziness in other people. It may have been within the WCJ's discretion to permit Worker to testify about what happened in language that speaks of causation. *See* SCRA 1986, 11–701. As stated in the advisory committee's note to Federal Rule of Evidence 701 (which is identical to SCRA 11–701), "Witnesses often find difficulty in expressing themselves in language which is not that of an opinion or conclusion." 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* 702–03 (1992). But Worker's testimony that the chlorine "caused" his dizziness has no more probative value than if Worker had testified, "I became dizzy around the time that I was using chlorine."

Perhaps the WCJ relied on his own expertise regarding effects of the chemicals being used by Worker. In proper circumstances a WCJ may rely on his or her personal expertise. *See* 2B Arthur Larson, *The Law of Workmen's Compensation* § 79.53 (1989). For example, I suspect that any experienced WCJ has heard enough expert testimony on orthopedic injuries that the WCJ could properly fill in an omission in a report or testimony by an orthopedic surgeon when the omission is an inference that orthopedic surgeons commonly make but was not spelled out in the particular instance at issue. Yet, when a WCJ relies on his or her expertise, the WCJ should refer to that expertise in the find-

ings and conclusions. Otherwise, appellate review is impossible. Nothing in the record in this case suggests that the WCJ relied on his expertise with respect to chemicals being used by Worker. In fact, I question whether the WCJ believed that Worker's dizziness was caused by workplace chemicals. The WCJ made no finding regarding the cause of Worker's dizziness. The absence of such a finding, together with the WCJ's denial of Employer's motion for "directed verdict" at the close of Worker's case-in-chief (the evidence regarding chlorine was not offered until Worker's case on rebuttal), suggests that the WCJ did not believe that Worker's recovery depended on establishing that workplace chemicals caused his dizziness. In the absence of any indication that the WCJ relied on his personal expertise regarding chlorine, an appellate court should not presume such expertise to sustain a determination that Worker's accident arose out of his employment.

The WCJ likewise did not indicate that he relied on judicial notice. Judicial notice, however, can be taken at any stage of a proceeding, SCRA 1986, 11–201(F), even on the court's own initiative, SCRA 11–201(C), and even on appeal. Fed.R.Evid. 201 advisory committee's note 2(f), found in 1 Weinstein, *supra*, at 201–10 to –11. Perhaps every adult has heard that chlorine is poisonous. But the question here is whether the chemical being used by Worker caused *dizziness* in the circumstances of this case. One problem is that Worker did not adequately describe the chemical he was using. Although he stated that it was "all chlorine" and that he "was using an airhose to sanitize the pipes with chlorine," one may doubt that he was simply spraying chlorine gas through the cheese equipment. Worker made no mention of the use of a gas mask or other protective device to avoid breathing chlorine. When he testified that if the substance "gets on your skin, it will burn your skin," he appears to be describing a solid or liquid. Literature regarding dairy operations suggests that Worker may have been using a chloramine solution. *Chlorine: Its Manufacture, Properties And Uses* 515, 527–28 (J.S. Sconce ed.,

1962). In any event, a reasonable search of literature on chlorine and chlorine compounds uncovered only one report of toxic effects from the fumes of solutions of chlorine or chloramine. An asthmatic woman suffered asthma after entering a swimming pool area and after using a liquid chlorine rinse. *Chlorine and Hydrogen Chloride* 119 (National Academy of Sciences 1976) (citing J.M. Sheldon & R.G. Lovell, Asthma Due to Halogens, *Amer. Practitioner* 4:43–44 (1949)). Even the literature on chlorine *gas* infrequently describes "dizziness" as a symptom, which at the least makes one question whether the sole symptom is likely to be dizziness. (Eye irritation is a commonly noted symptom). Perhaps the search of scientific literature missed some definitive source supporting Worker's theory of how he became dizzy. Nevertheless, unless such literature is brought to this Court's attention, judicial notice cannot cure the lack of expert evidence at the hearing.

That leaves the possibility that the WCJ could infer simply from the circumstances of Worker's dizziness that it was caused by the chemicals he was using in his job. As I stated at the outset, I do not rely on Section 52–1–28(B) to require that the causal connection be established by expert testimony. Yet, even in the absence of a statutory requirement, proof of a causal connection requires expert testimony when lay persons could only speculate. Thus, in medical malpractice cases "expert testimony is generally required to establish causal connection." *Cervantes v. Forbis*, 73 N.M. 445, 448, 389 P.2d 210, 213 (1964).

No precise formula determines when expert testimony is required. Professor Larson states, "[R]eliance on lay testimony and administrative *expertise* is not justified when the medical question is no longer an uncomplicated one and carries the factfinders into realms which are properly within the province of medical experts." 2B Larson, *supra*, § 79.54, at 15–426.222. The question is what realms are "within the province of medical experts."

When the effect of a substance on the human body is not a matter of common

knowledge, courts generally will not permit fact finders to speculate on a causal connection. *See Loudermill v. Dow Chemical Co.*, 863 F.2d 566, 570 (8th Cir.1988) ("Laymen cannot give opinion as to the causes of disease and death."). In *Hicks v. Vennerbeck & Clase Co.*, 525 A.2d 37 (R.I.1987), the worker claimed that his chest pain had been caused by exposure to sulfuric-acid fumes. The court wrote that the worker's "testimony, even if afforded full credibility and though establishing a contemporaneous experience of chest pain, is insufficient as a matter of law to raise the inference that inhalation of the fumes caused and continues to cause chest pain." *Id.* at 43.

*Sheptur v. Proctor & Gamble Distributing Co.*, 261 F.2d 221 (6th Cir.1958), considered a claim by a worker employed as a dishwasher that her contact dermatitis was caused by Tide. The opinion affirmed the trial court's decision that lay testimony did not suffice to require submission of the case to the jury.

In *Blarjeske v. Thompson's Restaurant Co.*, 325 Ill.App. 189, 59 N.E.2d 320 (1945), two people became ill, vomited, and suffered from diarrhea within 15 to 45 minutes of sharing a sandwich containing roast beef with a green material covering it. The court reversed a verdict in favor of the consumers, holding that in the absence of medical testimony the jury was required to speculate on causation.

In *Payne v. Chandler*, 41 Ga.App. 385, 153 S.E. 96 (1930), the court ruled that a patient's experience of chest pains after swallowing a disagreeable liquid provided by a dentist was insufficient to authorize a causal inference.

Perhaps in some circumstances expert testimony would not be necessary to establish that Worker's employment caused his dizziness. For example, if several healthy workers in the cheese room all became dizzy at the same time, the WCJ could properly infer the causal connection, even without knowing the precise mechanism that induced the dizziness.

But the evidence in this case is far weaker than in the example. What is most striking about Worker's contention that chlorine caused his dizziness is the vagueness of his account. We can only guess as to the form of the chemical he was using (liquid or gas), the manner in which he was using it, the nature of the area (spacious or confined) in which he was working, the mechanism by which he could have been exposed to chlorine, the stage in the cheese-making process at which he experienced symptoms, the number of occasions on which he experienced symptoms, etc. Although Worker suffered a second severe dizzy spell on March 25, he made no attempt to correlate that episode with exposure to chlorine. We know nothing about whether similar symptoms were suffered by other employees present in the cheese room on the days that Worker became dizzy or on the three days that he was off work with bronchitis. Nothing in the record informs us of typical symptoms of exposure to chlorine or whether Worker's symptoms are consistent with such exposure.

The evidence presented at the hearing was so vague that I doubt whether even an expert on the effects of chlorine could infer that Worker's dizziness was probably caused by chlorine. It would be impossible on this record to make a reliable estimate of the concentration of chlorine gas in the air to which Worker was exposed or the duration of Worker's exposure—which are surely data necessary to evaluate the probability that Worker's symptoms were caused by chlorine. It is not as if chlorine gas, regardless of concentration in the air, is always likely to cause illness. This point is illustrated by a brief summary of some facts in the recent case of *Aldrich v. Lamb–Weston, Inc.*, 122 Idaho 361, 834 P.2d 878 (1992). The worker seeking compensation benefits worked in a room in which a mist of water and chlorine was sprayed onto food. The chlorine level was ordinarily maintained at 30 to 50 parts per million (ppm). After a day in which the chlorine level rose to 200 ppm for 5½ hours during his shift, the worker began having breathing problems. The court upheld a ruling by the state industrial commission, which denied benefits because it was not

persuaded by the evidence of causation of later-diagnosed lung disease.

In my opinion a reasonable lay person could not infer causation on this record. Any finding that Worker's dizziness was caused by the chemicals he was using in the cheese room would be based solely on speculation. The cases relied on by the majority are not to the contrary.

Moreover, appellate review of the sufficiency of the evidence is more intense in a worker's compensation case. We apply whole record review. *Tallman v. ABF (Arkansas Best Freight)*, 108 N.M. 124, 767 P.2d 363 (Ct.App.1988). Thus, it is particularly significant that (1) Worker did not mention to any health care provider or fellow employee that his dizziness was caused by chlorine and (2) on cross-examination in his case-in-chief he stated that he could not think of any cause of his dizziness other than the bronchitis he was suffering at the time. His first mention of chlorine was in his rebuttal testimony, almost two weeks after Employer had moved for judgment on the ground that Worker had failed to establish that his dizziness was caused by his work. One need not doubt Worker's credibility to infer that the temporal correlation between chlorine and his dizziness must not have been so tightly knit as to suggest (at least without considerable cerebration) to a lay person that the dizziness was caused by chlorine.

Although my conclusion in this case is not predicated on Section 52–1–28(B), some history surrounding that statute suggests its pertinence to this decision. Section 52–1–28(B) requires that in workers' compensation cases the causal connection between the worker's disability and an accident must be established by expert medical testimony. This rule was first enacted in 1959. 1959 N.M. Laws, ch. 67, § 7.

I suspect that it is no coincidence that this provision was adopted in the first legislative session after mandate issued in *White v. Valley Land Co.*, 64 N.M. 9, 322 P.2d 707 (1957), *reh'g denied*, 64 N.M. 9, 322 P.2d 707 (1958). The worker in that case severely twisted his leg while helping to lift a 200–pound steel beam. He suf-

fered a muscle strain but no fracture. When he did not improve under treatment, an orthopedic surgeon conducted a thorough examination, which established cancer of the bone arising from metastasis from another organ. He died of cancer less than 10 months after his injury. The jury awarded workers' compensation death benefits to his widow. By a 3–2 majority the Court affirmed the award.

The Supreme Court majority acknowledged that the "[m]edical testimony goes no further than establishing [that the accident caused the spread of cancer to the left leg and hastened the worker's death] as a possibility." *Id.* at 14, 322 P.2d at 710. The majority opinion does not quote the medical testimony establishing a possibility. The dissent responded:

A fair sample of the type of medical testimony adduced in this case may be given. At the time, counsel on cross-examination was endeavoring to draw from Dr. McIntire an admission that the trauma testified to had either caused, or accelerated, the cancer. It follows:

"Q. And when you say that is very possible that it occurred, or very probable that it occurred, it is just as probable that it accelerated from the injury, is it not?

"A. Not in my opinion.

"Q. But it is possible, in your opinion?

"A. Anything is possible."

*Id.* at 17, 322 P.2d at 712. What the majority did quote from the record was the following testimony of Dr. John F. Boyd:

"We know of no relationship between trauma, that is, injury, and cancer. Primarily, this is because we don't know the etiology of cancer."

*Id.* at 15, 322 P.2d at 711. The majority then went on to say:

Medical men are justifiably reluctant to make a definite statement as to the relationship in view of the fact that they have no actual knowledge at the present time on which such a statement could in all good conscience be made. Aggravation of cancer or other disease may be inferable despite the lack of medical evi-

dence establishing indisputable causal connection between trauma and spread of pre-existing cancer *whenever the sequence of events is so strong as to establish a causal connection.* *Id.* (emphasis added). The majority stated that it was following the "recent trend" to regard medical testimony that causation was probable as "desirable but not essential." *Id.* at 14, 322 P.2d at 710.

What is the lesson here? One lesson is that the proposition "post hoc, ergo propter hoc" has a seductive power on the human mind. One dictionary contains the following entry on that phrase: "after this, therefore because of this: used in logic to describe the fallacy of thinking that a happening which follows another must be its result[.]" *Webster's New World Dictionary* 1113 (2d college ed. 1984). When courts do not guard against application of this "fallacy of thinking" by the fact finder, they are dispensing justice by speculation. Such decision-making brings discredit, probably deserved, upon the judicial system. For example, I can imagine the discussions in the medical community after physicians learned of the result in *White*. *See* 1 Larson, *supra*, § 12.24, at 3–453 (1990) (quoting a physician as saying that pathologists do not view trauma as a cause of the initiation or stimulation of cancer); Peter W. Huber, *Galileo's Revenge*, ch. 3 (1991) (discussing the tension between the courts and physicians regarding the relationship between trauma and cancer). The medical community's complaint would not have been that a widow received a workers' compensation award. The complaint would have been that the state's courts were governed by ignorance and even anti-science bias. Such concerns must have contributed to the legislature's enactment of what is now Section 52–1–28(B).

I am not suggesting that courts should be bound by the majority view of the medical profession or of any other scientific group. I am not advocating the *Frye* test. *See Frye v. United States*, 293 F. 1013 (D.C.Cir.1923) (affirming refusal to admit evidence of polygraph examination; scientific evidence inadmissible unless generally accepted in the pertinent scientific field). I

am simply suggesting that on matters outside of common knowledge or experience the courts must insist on evidence, not speculation, and post-hoc-ergo-propter-hoc reasoning is generally, as in this case, no better than speculation.

Therefore, I dissent from the majority's opinion that the evidence was sufficient to sustain a finding that Worker's dizziness was caused by chlorine.

## II. PROPRIETY OF REBUTTAL TESTIMONY

I should also briefly address Employer's claim that the WCJ erred in permitting Worker's rebuttal testimony regarding chlorine. As the majority notes, we leave to the trial judge's discretion the decision whether to admit rebuttal evidence. Perhaps that discretion is unreviewable. I would hope, however, that other trial judges would not follow the example set in this case. Worker's testimony was not proper rebuttal. The majority suggests that the rebuttal testimony was responding to cross-examination of Worker during Worker's case-in-chief. Redirect examination, not rebuttal, is the appropriate means of rehabilitating a witness whose testimony in the case-in-chief is weakened by cross-examination. In any event, Worker's chlorine testimony was not a response to evidence put on by Employer. It was a response to Employer's contention that Worker had not established an essential element of his claim—that the accident arose out of his employment. Rebuttal is not the proper method of proving an element of the claim omitted in the case-in-chief.

The only rational basis for allowing Worker to testify in rebuttal regarding chlorine would be that the WCJ did not expect the testimony to affect his decision. I have already suggested that the WCJ may have thought (perhaps correctly) that Worker could recover even if no workplace chemical caused his dizziness. Even then, however, admitting the testimony was a mistake. This case illustrates the mischief

that can arise from excessive leniency in enforcing procedural rules.