This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**MICHELLE RUIZ**,

Worker-Appellant/Cross-Appellee,

v.                                                                            **No. 31,454**

**LOS LUNAS PUBLIC SCHOOLS**
**and NEW MEXICO PUBLIC SCHOOLS**
**INSURANCE AUTHORITY,**

Employer/Insurer-Appellees/Cross-Appellants.

**APPEAL FROM THE WORKERS' COMPENSATION ADMINISTRATION**
**Gregory D. Griego, Workers' Compensation Judge**

Law Office of Mel B. O'Reilly, LLC
Mel B. O'Reilly
Albuquerque, NM

for Appellant

Maestas & Sugett, P.C.
Paul Maestas
Albuquerque, NM

for Appellees

**MEMORANDUM OPINION**

**VIGIL, Judge.**

{1}     In this workers' compensation case, Worker appeals and Employer cross-appeals from the compensation order entered by the workers' compensation judge following a trial on the merits. For the reasons set forth below, we affirm in part and reverse in part.

**BACKGROUND**

{2}     Worker was working as a school bus driver with the Los Lunas Public Schools (Employer) when she injured her back and shoulder on October 8, 2007. Following a formal hearing, the workers' compensation judge (WCJ) found that Worker had failed to perform a prescribed home exercise program during her recovery and this failure constituted an injurious practice; that Worker had unreasonably refused two job offers from Employer for positions she was capable of performing at her pre-injury wage; and that her residual physical capacity was light duty. Based on these findings, Worker was awarded no temporary total disability (TTD) benefits after the date she rejected the job offers, and permanent partial disability (PPD) benefits based on an average weekly wage (AWW) of $270.30, with a seven percent impairment with no modifiers. Following a hearing on Worker's attorney fees, the WCJ found that Employer's offer of compensation was untimely, and Employer was ordered to pay fifty percent of Worker's attorney fees.

**ISSUES**

{3}     On appeal, Worker contends the WCJ erred when it: (1) included wages from the 2006-2007 school year in determining Worker's AWW; (2) found that Worker had persisted in an injurious practice by not following a home exercise program and reduced Worker's impairment rating by one percent; (3) denied Worker's TTD benefits and PPD modifier benefits due to her rejection of job offers; and (4) classified Worker's residual physical capacity as light duty when there was evidence she was unable to push or pull with her arms. In its cross-appeal, Employer argues the WCJ erred by: (1) reducing Worker's impairment rating by one percent for her injurious practice because the evidence supports a reduction of no less than five percent; and (2) ordering Employer to pay fifty percent of Worker's attorney fees because Employer had made a valid offer of compensation prior to the start of trial.

**STANDARD OF REVIEW**

{4}     "We review workers' compensation orders using the whole record standard of review." *Leonard v. Payday Prof'l*, 2007-NMCA-128, ¶ 10, 142 N.M. 605, 168 P.3d 177. "In applying whole record review, this Court reviews both favorable and unfavorable evidence to determine whether there is evidence that a reasonable mind could accept as adequate to support the conclusions reached by the fact finder." *Levario v. Ysidro Villareal Labor Agency*, 120 N.M. 734, 737, 906 P.2d 266, 269 (Ct. App. 1995). "Under whole record review, the court views the evidence in the light

most favorable to the agency decision, but may not view favorable evidence with total disregard to contravening evidence." *Tallman v. ABF (Arkansas Best Freight)*, 108 N.M. 124, 128, 767 P.2d 363, 367 (Ct. App. 1988) (citations omitted), *holding modified on other grounds by Delgado v. Phelps Dodge Chino, Inc.*, 2001-NMSC-034, 131 N.M. 272, 34 P.3d 1148. We review the WCJ's application of the law to the facts de novo. *Tom Growney Equip. Co. v. Jouett*, 2005-NMSC-015, ¶ 13, 137 N.M. 497, 113 P.3d 320.

**DISCUSSION**

**I.      Worker's Average Weekly Wage**

{5}      Under NMSA 1978, Section 52-1-20(B) (1990), a worker's "average weekly wage shall be determined by computing the total wages paid to the worker during the twenty-six weeks immediately preceding the date of injury and dividing by twenty-six." *Id.* "[I]f the worker worked less than twenty-six weeks in the employment in which the worker was injured, the average weekly wage shall be based upon the total wage earned by the worker in the employment in which the worker was injured, divided by the total number of weeks actually worked in that employment." Section 52-1-20(B)(1). "[I]n any case where the foregoing methods of computing the average weekly wage of the employee . . . will not fairly compute the average weekly wage, in each particular case, computation of the average weekly wage of the employee in

4

such other manner and by such other method as will be based upon the facts presented [to] fairly determine such employee's average weekly wage." Section 52-1-20(C).

{6} In calculating Worker's AWW, the WCJ determined that "Worker's wage can be fairly calculated under Section 52-1-20(B). Wages paid from April 6, 2007 to October 5, 2007 (182 days) total $7,027.86 divided by 26 equals $270.30." Worker contends that the WCJ should have calculated her AWW under Section 52-1-20(B)(1) because a new period of employment began in August 2007 under the terms of her contract, and because she was not offered work during the summer. Worker alternatively argues that this Court should calculate her AWW pursuant to Section 52-1-20(C) because the calculation methods provided under either Section 52-1-20(B) or Section 52-1-20(B)(1) will result in an unrealistic calculation. Employer contends that the WCJ correctly applied the plain language of Section 52-1-20(B) after determining that Worker had been paid by the school district for the twenty-six weeks proceeding her injury. We agree.

{7} Under the terms of her employment contract, Worker was paid over a fifty-two week calender year for approximately forty weeks of actual work. Therefore, even though Worker was not offered work as a bus driver during the summer months, her payroll records indicate that she continually received wages for her work from the 2006-2007 school year during this time. The plain language of Section 52-1-20(B)

5

specifies that a worker's AWW is calculated by examining "the total wages paid to the worker during the twenty-six weeks immediately preceding the date of injury," indicating that our focus is on the wages earned by Worker, not whether she was actually working during this time. Because Worker's payroll records indicate that she did receive wages over the course of the twenty-six weeks preceding her injury, we find that the WCJ's AWW calculation under Section 52-1-20(B) was appropriate. *See Eberline Instrument Corp. v. Felix*, 103 N.M. 422, 424, 708 P.2d 334, 336 (1985) ("Where such wages are easily calculable and fairly compute the worker's average weekly salary, then the methods for calculating benefits under Section 52-1-20(B) control."), *superceded by statute as stated in Villanueva v. Sunday Sch. Bd.*, 121 N.M. 98, 908 P.2d 791 (Ct. App. 1995); *see, e.g., Vinyard v. Palo Alto Inc.*, 2013-NMCA-001, ¶ 16, 293 P.3d 191 (illustrating propriety of adherence to methodology set forth in Section 52-1-20(B) where a fair computation results).

**{8}** Worker contends that Section 52-1-20(B) is inapplicable here because the terms of her contract and the fact that she did not work during the summer months preceding her injury establish that she had not worked for twenty-six weeks in the employment. We disagree. The contract for the 2007-2008 school year between Worker and Employer states that Worker is "a non-certified employee with three or more consecutive years of employment with the School District" and neither party disputes

6

that Worker had worked as a bus driver for Employer for seven consecutive school years prior to her injury. Additionally, the fact that Worker did not work during the two summer months preceding her injury is not sufficient evidence to establish a new employment. *See Villanueva*, 121 N.M. at 102, 908 P.2d at 795 (finding that a seasonal worker who had not worked for approximately five months during the winter preceding her injury did not conclusively establish that a new period of employment had begun for purposes of an AWW calculation).

{9} Finally, Worker requests this Court to consider an alternative AWW calculation pursuant to Section 52-1-20(C) due to the fact that the 2007-2008 contract was a recent change in Worker's circumstances. In reviewing Worker's payroll records, we find no substantial shift in her wages earned during the 2006-2007 and 2007-2008 school years and Worker makes no argument to explain any effect that the most recent contract had on her wages. *See Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076 ("We will not review unclear arguments, or guess at what [a party's] arguments might be."). Further, we find no reason to resort to a Section 52-1-20(C) calculation as the WCJ's calculation under Section 52-1-20(B) resulted in a fair and accurate AWW for Worker. *See Eberline*, 103 N.M. at 424, 708 P.2d at 336 ("There is no reason to calculate [the worker's] benefits under Section 52-1-20(C) because the method provided under Section 52-1-20(B)(4) fairly computes

what [the worker's] average weekly wage was at the time of the accident. Section 52-1-20(C) is to be resorted only in unusual circumstances . . . where a worker's average weekly wage cannot fairly be determined by the precise methods outlined in Section 52-1-20(B)."); *see, e.g., Vinyard*, 2013-NMCA-001, ¶ 16 (emphasizing this Court's preference of the application of Section 52-1-20(B) or Section 52-1-20(B)(1) over that of Section 52-1-20(C)).

**II.    Worker's Home Exercise Program**

{10}    Next, the WCJ found that "Worker has persisted in an injurious practice which has increased Worker's disability or retarded Worker's recovery from injury. The practice is failure to follow the home exercise plan." Under NMSA 1978, § 52-1-51(I) (2005), "[i]f any worker persists in any unsanitary or injurious practice that tends to imperil, retard or impair the worker's recovery or increase the worker's disability . . . , the workers' compensation judge may in the judge's discretion reduce or suspend the workers' compensation benefits." To "persist in any injurious practice" means "that a workman must, as a matter of habit, go on resolutely or stubbornly in spite of opposition, importunity or warning, to inflict or tend to inflict injury to himself." *Martinez v. Zia Co.*, 99 N.M. 80, 82, 653 P.2d 1226, 1228 (Ct. App. 1982) (alteration and internal quotation marks omitted).

8

{11} Worker challenges the finding of the WCJ, contending that she was never prescribed to perform a specific home exercise program by her health care professionals. On cross-appeal, Employer argues the WCJ correctly found Worker had persisted in an injurious practice, but erred in reducing Worker's impairment rating by only one percent because the evidence supports a reduction of at least five percent.

{12} A home exercise program appears to have been an anticipated part of Worker's therapy. Worker's initial referral for physical therapy specified the need for a home exercise program as part of her rehabilitation. Notations from her various visits with her physical therapists indicate that implementing a home exercise program was planned. However, there is a note from her physical therapist, stating that "[Worker] reports she has not been performing any [home exercise program], reports she has not received any home therapy." Further, there is no indication that Worker's doctors or physical therapists ever implemented the planned program by prescribing specific home exercises for Worker to perform during her recovery.

{13} There is evidence that two independent evaluators recommended that Worker perform a home exercise program to improve her recovery. The first recommendation came from MaryBeth Plummer, who commented that "[Worker] has not worked for two years and three months; therefore, performing range of motion and mild

9

strengthening exercises may be beneficial for her and could be performed with Thera-Band and light weights at home after proper instruction." Ms. Plummer was a physical therapist that examined Worker for purposes of a functional capacity evaluation (FCE) on January 4, 2010, and compiled her report because "Ms. Ruiz is approaching maximum medical improvement regarding her work-related shoulder and cervical injuries and permanent lifting restrictions need to be established."

{14} The other recommendation came from Dr. Juliana Garcia, who stated in her IME report that "Ms. Ruiz reports that she is not performing a home exercise program daily and only performs it once per month . . . . I recommend a home-based, self-directed exercise program. Ms. Ruiz should be participating in a daily home-based exercise regimen which includes components directed toward strengthening, stretching, flexibility, aerobic and cardiovascular condition." However, the IME report was created for litigation, it is addressed only to the attorneys for the parties, and it does not appear that either Worker or her treating physicians received a copy. Further, the report specifically states that the "[m]edical recommendations are offered or provided as guidance and not as medical orders. The opinions expressed do not constitute a recommendation that specific claims or administrative functions be made or enforced."

{15}    While we agree with Employer that Dr. Garcia's deposition testimony establishes that Worker never did home exercises, neither her testimony nor the record establishes that Worker was ever prescribed a specific home exercise program by any of her health care professionals.  As Worker was never instructed to perform any specific exercises, she could not have acted "in spite of opposition, importunity or warning." *Martinez*, 99 N.M. at 82, 653 P.2d at 1228.  Thus, we conclude the WCJ erred in finding Worker had persisted in an injurious practice.  *See id.* (reversing a finding that the worker had persisted in an injurious practice after being informed by his doctors that he "should lose this excess weight" due to the district court's lack of findings regarding what actions the worker had done, or not done, that constituted an injurious practice)  Consequently, we need not address Employer's cross-appeal regarding the percentage of benefits to be reduced as a result of the WCJ's findings of Worker's injurious practices.

**III.    Employer's Job Offers**

{16}    Worker contends that the WCJ erred when it denied her TTD and PPD modifier benefits because her rejection of the job offers was due to the fact that she was "unable to work as a school bus driver or school crossing guard because of her injury" and that she was not offered a job after the date she reached MMI.  Employer argues the evidence supports the WCJ's decision to deny TTD benefits because Employer

11

had offered Worker two jobs at her pre-injury wage and PPD modifier benefits because Worker's rejection of the two job offers was unreasonable. We address each in turn.

**a.      Worker's Temporary Total Disability Benefits**

{17}     Under NMSA 1978, Section 52-1-25.1(B)(1) (2005), "[i]f, prior to the date of maximum medical improvement, an injured worker's health care provider releases the worker to return to work, the worker is not entitled to temporary total disability benefits . . . if the employer offers work at the worker's preinjury wage." Worker asserts that she remained eligible for TTD benefits throughout her recovery because "TTD means the inability of the Worker, by reason of accidental injury . . . to perform the duties of that employment prior to the date of worker's MMI" and that "her injury and medication caused her to be unable to work" even after her doctor released her to return to work. Employer argues that the WCJ correctly denied the TTD benefits because Employer offered Worker two jobs at her pre-injury wage and that Worker's views regarding her ability to perform the offered positions are irrelevant under the language of the statute.

{18}     "Section 52-1-25.1 applies so long as the worker is offered the position, even if the worker does not accept and become rehired." *Jeffrey v. Hays Plumbing & Heating*, 118 N.M. 60, 63, 878 P.2d 1009, 1012 (Ct. App. 1994). However, in order

to render the worker ineligible to receive TTD benefits, the work offered must be that which the worker is capable of performing. *Garcia v. Borden, Inc.*, 115 N.M. 486, 493, 853 P.2d 737, 744 (Ct. App. 1993). The worker's capabilities are established in the release to work, which anticipates that a worker return to the type of work that he was doing prior to the injury. *Id.* If the work required of the worker is more strenuous than that which he was doing in his prior work assignment, the work must be that which the worker is physically capable of performing. *Id.*

{19}     On January 9, 2007, Dr. Ross released Worker to return to work under a light level of duty, limiting her to "[l]ifting 20 pounds maximum with frequent lifting and/or carrying objects weighing up to 10 pounds" and noting that she "[m]ay return to driving [a] bus." After receiving notification of her release to return to work, Employer offered Worker her former bus driver position with a twenty-pound lifting restriction, which she refused. Employer then made a second offer of employment for a crossing guard position, which Worker also refused. Both the modified bus driver position and the crossing guard position fell within the confines of the release to work and were no more strenuous than Worker's original bus driver position. *Contra Garcia*, 115 N.M. at 493, 853 P.2d at 744 (finding that a worker who refused job offer for a different position that was more strenuous with different duties than his pre-injury work remained eligible for temporary total disability benefits as he was unable

13

to perform the offered work). Thus, we find the WCJ's application of Section 52-1-25.1 is appropriate.

**{20}** Worker cites *Ortiz v. BTU Block & Concrete Co.*, 1996-NMCA-097, 122 N.M. 381, 925 P.2d 1, to support her contention that she "is entitled to benefits pre-MMI if the injury sustained in the accident is the reason for refusing work." In *Ortiz*, we overturned the district court's denial of TTD benefits to a worker who was terminated shortly after sustaining her injury. 1996-NMCA-097, ¶ 10. We held that the worker remained eligible for TTD benefits because the employer had not made an offer to return to the employment after the worker had been released to work by her doctors and thus, application of Section 52-1-25.1(B) was not proper. *Id.* ¶ 8 ("An offer of employment is a prerequisite to the applicability of Section 52-1-25.1(B) and (C)."). Accordingly, unlike Worker, the worker in *Ortiz* did not have an opportunity to refuse work due to her injury as an offer of employment was never made. We therefore conclude that *Ortiz* is inapplicable here.

**{21}** Worker also cites *Feese v. U.S. West Service Link, Inc.*, 113 N.M. 92, 94, 823 P.2d 334, 336 (Ct. App. 1991) to further argue that "Section 52-1-25.1 grants Worker TTD benefits as long as . . . Worker's inability to perform the duties of that employment . . . is due to the work injury." *Feese* concerned a worker who continued to receive TTD benefits after she retired from her job. 113 N.M. at 94, 823 P.2d at

14

336. We concluded that the worker was "totally disabled because she was unable to perform any work due to an accidental injury" and therefore entitled to TTD benefits. *Id.* at 95, 823 P.2d at 337. Unlike this case, there is no indication that the worker in *Feese* had been ever released to return to work by her doctors at any time during her recovery. Moreover, we focused our reasoning in *Feese* on whether the worker's retirement, rather than her injury, had removed the worker from the labor market. *Id.* at 94-95, 823 P.2d at 336-337. Accordingly, *Feese* is of no assistance to Worker in this case.

{22} Worker cites no other case law supporting her assertion that her subjective beliefs about her capabilities trump those of her attending physician with respect to the terms of the release to work. Further, Worker fails to distinguish case law rejecting this same argument as a reasonable justification for refusing a job offer. *See Sanchez v. Zanio's Foods, Inc.*, 2005-NMCA-134, ¶ 67, 138 N.M. 555, 123 P.3d 788 ("[W]e are aware of [no case law] in New Mexico[ ] that permits [the w]orker to decline a job offer based alone on his own subjective view of his ability to perform the offered work, where the job comes within the restrictions placed by the worker's doctor."). Thus, we affirm the WCJ's denial of TTD benefits pursuant to Section 52-1-25.1.

**b. Worker's Permanent Partial Disability Modifications**

15

{23} NMSA 1978, Section 52-1-26(D) (1990) states, "[i]f, on or after the date of maximum medical improvement, an injured worker returns to work at a wage equal to or greater than the worker's pre-injury wage, the worker's permanent partial disability rating shall be equal to his impairment and shall not be subject to the modifications calculated." *Id.* However, permitting a worker to evade application of this section by voluntary unemployment or underemployment is contrary to the purposes of the Workers' Compensation Act. *Jeffrey*, 118 N.M. at 64, 878 P.2d at 1013. Thus, a worker becomes ineligible for modifier benefits pursuant to Section 52-1-26(D) when either the worker accepts employment at or above his pre-injury wage or unreasonably refuses offered employment at or above his pre-injury wage. *Cordova v. KSL-Union*, 2012-NMCA-083, ¶ 13, 285 P.3d 686, *cert. denied*, 2012-NMCERT-007, ___ P.3d ___.

{24} Worker first challenges the WCJ's finding that she unreasonably refused the job offers. As with her challenge to the denial of the TTD benefits, Worker contends that application of Section 52-1-26(D) was improper here as she "was unable to work because of her injury" and that she "should not be penalized for protecting her health, the safety of children while on medication, or avoiding further injury to herself when her shoulder injury was not properly diagnosed and caused her severe pain." Employer argues that the WCJ correctly denied the modifier portion of her PPD

16

benefits after finding that "Worker would have been earning a wage equal to or greater than her pre-injury wage after [MMI] had she accepted the Employer's light/modified duty job offers." We conclude the record supports the findings of the WCJ.

{25} Worker argues that she was unable to accept the modified bus driver position because her medication made her drowsy and the instructions warned against operating machinery while using the medication. Worker notified Employer of these concerns, and the record indicates that Worker told her doctor she was unable to perform the bus driver position because of her inability to turn her head from side to side, the effects of the medication, and her continuing shoulder pain.

{26} In spite of her stated reasons for not accepting the offered bus driver position, Worker appears to have continued to drive her own vehicle throughout the relevant time period. In releasing her to return to work, Worker's doctor noted that he found "no clinical evidence to support suspension of [Worker's] driving activities." Additionally, Worker continued to use the medication after her doctor opted to discontinue it rather than take her off of work. Worker's use of the medication continued even after her doctor informed her that the continued use of the medication was directly against his orders.

17

{27}     As for the crossing guard position, Worker asserts that she refused the offer due to her continuing shoulder pain. While there is no evidence that Worker informed Employer of this reasoning, there is documentation that she told others that she rejected Employer's second offer because of the cold weather and because she believed she could not perform the position, despite the release to work indicating her capacity to work as determined by her doctor.

{28}     As we briefly addressed earlier, we have affirmed a WCJ's rejection of similar arguments as unreasonable reasons for declining a job offer. *See Sanchez*, 2005-NMCA-134, ¶¶ 64, 67-69 (noting WCJ's rejection of the worker's arguments as illegitimate reasons for refusing offered work, including: (1) that he felt it was not safe for him to operate a large vehicle while taking his medication, even though his doctor at one point had temporarily restricted him from working due to the effects of the medications; and (2) his belief that he was unable to perform the work, though the job fell under the restrictions of his doctor's release to work). We therefore affirm the finding of the WCJ.

{29}     We are further unpersuaded by Worker's apparent interpretation of Section 52-1-26(D) requiring Employer to make her a job offer after the date Worker reached MMI to render her ineligible for the modifier portion of her PPD benefits. We note that Worker cites to no authority in support of this contention that the timing of the

18

job offer is determinative. *See In re Adoption of Doe*, 100 N.M. 764, 765, 676 P.2d 1329, 1330 (1984) (holding that where a party cites no authority to support an argument, this Court may assume no such authority exists). Thus, we decline to adopt Worker's proposed Section 52-1-26(D) interpretation.

**IV.    Worker's Residual Physical Capacity**

{30}    Worker argues that the WCJ erroneously classified her residual physical capacity as light because she is unable to push or pull with her arms, contrary to the requirements under NMSA 1978, Section 52-1-26.4 (2003).  Under Section 52-1-26.4(C)(3), a light physical capacity determination:

> means the ability to lift up to twenty pounds occasionally or up to ten pounds frequently.  Even though the weight lifted may be only a negligible amount, a job is in this category when it requires walking or standing to a significant degree or when it involves sitting most of the time with a degree of pushing and pulling of arm or leg controls or both.

A sedentary physical capacity determination "means the ability to lift up to ten pounds occasionally or up to five pounds frequently."  Section 52-1-26.4(C)(4).

{31}    We find no error in the WCJ's finding that Worker's residual physical capacity was light duty.  The WCJ heard evidence that Worker had been released to work twice in a light duty capacity by her treating physicians.  The two independent medical examiners also agreed that Worker's abilities were consistent with a light duty designation.  Despite this evidence, Worker points out a few lines of deposition

19

testimony from Dr. Garcia as conclusive proof of her inability to push and pull with her hands. However, in this same testimony, Dr. Garcia assigned Worker a light duty classification, noted certain inconsistencies with Worker's use of her hands during her evaluation, and stated that she did not believe that these inconsistencies were a true representation of Worker's capacities. We conclude that the record supports the WCJ's determination regarding Worker's residual physical capacity. *See generally Garnsey v. Concrete Inc. of Hobbs*, 1996-NMCA-081, ¶ 20, 122 N.M. 195, 922 P.2d 577 ("It is the duty of the fact-finder to weigh the evidence and resolve any conflicts.").

**V.     Employer's Offer of Compensation Order**

**{32}**     Lastly, we address Employer's cross-appeal regarding the award of Worker's attorney fees. NMSA 1978, Section 52-1-54(F) (2003) states that "[a]fter a recommended resolution has been issued and rejected, but more than ten days before a trial begins, the employer or claimant may serve upon the opposing party an offer to allow a compensation order to be taken against him[.]" Section 52-1-54(F)(3) then provides: "[I]f the employer's offer was greater than the amount awarded by the compensation order, the employer shall not be liable for his fifty percent share of the attorney fees to be paid the worker's attorney and the worker shall pay one hundred percent of the attorney fees due to the worker's attorney." Otherwise, "the payment

of a claimant's attorney fees . . . shall be shared equally by the worker and the employer." Section 52-1-54(J).

{33}     The WCJ denied application of Section 52-1-54(F)(3) by finding that Employer had made an untimely offer of compensation. Employer challenges this finding, arguing that the facts do not establish that trial commenced on March 28, 2011, as found by the WCJ, but rather on April 27, 2011, and thus its April 15, 2011 offer was timely. Because Employer's offer was greater than the amount awarded to Worker under the compensation order, Employer's appeal turns on whether trial had begun as scheduled on March 28, 2011.

{34}     We agree with Employer that the facts do not support a finding that trial began on March 28, 2011. On that date, the WCJ began by asking if the parties had "[a]ny preliminary matters prior to the presentation of evidence or opening statement requiring attention." Worker notified the WCJ of her pending motion to compel discovery from Employer and arguments were heard from both parties. After granting the motion and ordering Employer to send its responses to the interrogatories to Worker within fourteen days, a new trial date was set and the hearing was adjourned. No opening statements were made, no evidence was presented, no witnesses were sworn in or gave testimony, and the depositions and exhibits that had been submitted to the WCJ prior to the start of the proceedings were returned to the parties. During

21

the approximately eleven-minute hearing, the WCJ stated that "[w]e're not going to go to trial today," they would find "the first available trial date" to reschedule, and "this case has been rescheduled for purposes of trial on April 27." Lastly, the WCJ filed a written order granting Worker's motion to compel following the March 28, 2011 hearing, which noted that "[t]his matter is continued for Trial on April 27, 2011."

{35}     In light of the foregoing, we conclude that the WCJ erred in finding that trial began on March 28, 2011. *See Black's Law Dictionary* 1644 (9th ed. 2009) (defining a trial as "[a] formal judicial examination of evidence and determination of legal claims in an adversary proceeding"). A trial on the merits is "[a] trial on the substantive issues of a case, as opposed to a motion hearing or interlocutory matter." *Id.* at 1645. *Compare Willcox v. United Nuclear Homestake Sapin Co.*, 83 N.M. 73, 75, 488 P.2d 123, 125 (Ct. App. 1971) (finding that an employer's offer for compensation was untimely under an earlier version of Section 52-1-54(F) because it was not made thirty days prior to when the trial took place). Thus, we reverse the WCJ's order requiring Employer to pay fifty percent of Worker's attorney fees.

**CONCLUSION**

{36}     We conclude that the WCJ erred in determining that Worker had persisted in an injurious practice and ordering Employer to pay fifty percent of Worker's attorney

22

fees. We also reverse the WCJ's application of Section 52-1-54(F)(3). Therefore, we reverse and remand for calculation and entry of a compensation order in conformity with this opinion.

{37} **IT IS SO ORDERED.**

_____

**MICHAEL E. VIGIL, Judge**

**WE CONCUR:**

_____

**RODERICK T. KENNEDY, Chief Judge**

_____

**CYNTHIA A. FRY, Judge**