CALDWELL v. VESTAL.

5-3057                                        371 S. W. 2d 836

Opinion delivered November 4, 1963.

*McMath, Leatherman, Woods & Youngdahl,* for appellant.

*Barber, Henry, Thurman & McCaskill,* for appellee.

GEORGE ROSE SMITH, J. This workmen's compensation case involves an employer's liability for the expense

of a surgical operation performed upon an injured employee. The operation was a success, and we know now that it was necessary; but it was performed by a surgeon engaged by the employee against the wishes of the insurance carrier and at a time when the physician selected by the insurer thought surgery to be inadvisable. The commission's refusal to charge the employer with the expense of the operation was upheld by the circuit court.

There is no dispute in the material facts. Caldwell, the claimant, suffered a compensable back injury on August 23, 1960. He was unable to work for about a week, during which he was treated by a general practitioner. After the claimant returned to his job he continued to suffer pain, although he did not lose any more time from his work until he entered the hospital about fourteen months later.

Caldwell first saw a specialist on January 18, 1961, when the insurer sent him to Dr. Nixon, an orthopedic surgeon. In the course of visits extending over about two months Dr. Nixon prescribed an elevated shoe to compensate for a congenital difference in the length of Caldwell's legs.

On August 8, 1961, the claimant on his own initiative consulted Dr. Murphy, the orthopedic surgeon who was later to perform the operation in controversy. Dr. Murphy concluded that Caldwell had a disc problem and should have a myelogram. A myelogram is described as a diagnostic procedure in which an opaque dye is injected into the spinal canal so that X-ray pictures can be taken. In September Dr. Murphy sent the insurance company a bill for his services, but the insurer refused to pay it, explaining that medical attention was being provided by other doctors. Later on a representative of the insurer also told Caldwell himself that the company would not pay for the operation that Dr. Murphy had in mind.

Later in August the claimant, without authorization from the insurer, was treated unsuccessfully by a chiropractor.

On October 18, at the direction of the insurer, Caldwell went to Dr. Hundley, another orthopedic surgeon. Dr. Hundley diagnosed Caldwell's trouble as a degenerative disc and accordingly began a course of conservative daily therapy, involving exercise, heat application, and sonic treatments. On October 27, after nine days, the patient appeared to be greatly improved.

On Sunday, October 29, Caldwell's condition suddenly became much worse; he suffered severe pain in his back and partial paralysis. His wife called Dr. Murphy, who arranged for Caldwell's admission to a hospital. On Monday Dr. Murphy did a myelogram, which indicated that the patient was suffering not from a degenerative disc but from a more serious condition known as an extruded disc. This extruded disc had been forced from its position between two vertebrae and was lying in the spinal canal. On Tuesday morning Dr. Murphy operated, removing the extruded disc and fusing the two vertebrae that it had cushioned. After a convalescence of several months Caldwell was able to return to work with entire freedom from pain. His recovery was complete except for some stiffness that was occasioned by the bone fusion and that resulted in a slight permanent partial disability.

It is shown by undisputed evidence that the operation not only was necessary but also was successful. It is true that Dr. Nixon and Dr. Hundley, concededly qualified orthopedic surgeons selected by the insurer, testified that they would have continued conservative therapy for a while longer before considering a myelogram or surgery. But their preference for conservative measures was based upon their belief that Caldwell was suffering from a degenerative disc, for which conservative therapy is effective. Such treatment, however, is of no avail in the case of an extruded disc. Surgery alone can then give relief from pain and protection against the possibility of further complications. Thus the only real difference between the position taken by the insurer's doctors and that taken by Dr. Murphy is that the latter resorted to surgery earlier than the former thought such action to

be advisable. In this conflict of opinion hindsight proves conclusively that Dr. Murphy's decision was actually right. As the court observed in *Laws* v. *Industrial Comn.*, 116 Utah 432, 211 P. 2d 194, surgery has rendered certain that which was previously uncertain.

Our statute requires an employer to provide promptly for an injured employee such medical and surgical service ''as may be necessary'' during the period of six months after the injury and for such additional time as the commission may require. Ark. Stat. Ann. § 81-1311 (Repl. 1960). (We should add that the six-month limitation is not in issue here, for the insurer recognized its continuing obligation to provide medical care, as, for example, by sending Caldwell to Dr. Hundley more than a year after the injury occurred.)

There is much discussion in the briefs about the right of an injured employee to make his own free selection of a doctor. We do not reach this issue. Even if we should concede, without deciding, that the insurance carrier has the right in the first instance to select the physician, it does not unavoidably follow that Caldwell's later choice of Dr. Murphy exempts the appellees from the expense of the operation.

It was the employer's duty to provide this injured employee with necessary surgery. It has now been demonstrated with certainty that the operation was necessary. In fact, if the surgeons selected by the insurer had realized that the patient was suffering from an extruded disc they too would doubtless have recommended the procedures that Dr. Murphy adopted. The appellees ought not to be in a position to profit by their physicians' erroneous diagnosis, and this is true even though the error was made in complete good faith by doctors whose ability and standing are not questioned in the least.

Our holding is not intended to, and does not, give an injured workman unrestricted freedom to reject the medical care offered by his employer. Counsel for the appellant concede that Caldwell acted at his peril in overriding the insurer's warning that the proposed operation would

be at the claimant's own expense. If the operation had disclosed a degenerative disc, for which conservative treatment was indicated, the surgical expense would not have been the employer's responsibility. (Similarly, there is no contention that the appellees should pay for the claimant's unauthorized and unavailing visits to the chiropractor.) It develops, however, that it was Dr. Hundley's treatment that was in a sense unnecessary, in that it could not correct the condition that really existed, while the surgical operation was the right and necessary step. In this situation there is no sound basis for exempting the employer from liability upon the present claim. See *Atlas Powder Co.* v. *Grimes,* 200 Tenn. 206, 292 S. W. 2d 13.

The appellees also rely heavily upon this sentence in our compensation act: ''The Commission may order a change of physicians at the expense of the employer when, in its discretion, such change is deemed necessary or desirable.'' Ark. Stat. Ann. § 81-1311 (Repl. 1960). We believe that this provision was inserted in the statute to anticipate any possible doubt about the power of the commission to order a change of physicians. It should not be regarded as establishing an exclusive method of procedure, for, as a practical matter, an injured employee ordinarily has no lawyer and is not in a position to apply to the commission for a change of physicians. To construe the statute as narrowly as the appellees would have us do would convert this provision from a remedial measure designed to help the workman into a punitive measure designed to hurt him.

The judgment must be reversed, and the cause will be remanded, through the circuit court, to the commission for the entry of an award against the appellees for the reasonable expense of the surgical operation and for the claimant's disability during his period of convalescence. The award should also provide compensation for any permanent partial disability that the commission finds to exist.

Reversed.

McFADDIN, J., concurs; ROBINSON, J., dissents.

Ed. F. McFaddin, Associate Justice (concurring). The purpose of this concurrence is to emphasize my firm view that neither the employer nor the insurance carrier has the right to require an injured employee to be treated by a particular physician selected by the employer or insurance carrier, if the injured employee desires some other physician. I maintain that an injured employee has the right to select a physician of his own choosing. The statute (Ark. Stat. Ann. § 81-3111 [Repl. 1960]) says: "The employer shall promptly provide for an injured employee such medical, surgical, hospital, and nursing service . . . as may be necessary . . ." The important word in the statute is "provide": that means to "supply," or to "furnish." The statute does not deprive the injured employee of the great American free enterprise right to select the doctor who is to treat him. The relationship of physician and patient is a personal one; and our Workmen's Compensation Statute was not designed to usher in any phase of "state medicine."

I realize that this concurrence may be *dicta* in the present case; but nevertheless I think it wise to state my views on this matter at this time.

Sam Robinson, Associate Justice (dissenting). It might be well to keep in mind undisputed facts in this case. The employee was injured August 23, 1960; he went to see Dr. Napper (presumably a doctor of his own choice) for about a week and then returned to work; he continued working every day and did not again go to a doctor until he went to Dr. Nixon about five months later on January 18, 1961. Dr. Nixon saw him again on February 20, March 14, and October 6; a total of four times in about 10 months. All during this period the employee was working every day.

In the meantime, the employee had visited Dr. Murphy on August 8, 1961. At that time Dr. Murphy reported: "Mr. Caldwell is a 31 year old white male who,

in my opinion, has a disc problem. . . . It is possible that surgery will have to be resorted to, but, of course, this depends on the symptoms and the wishes of the patient. At this time the patient has a disability in the neighborhood of 15% as related to the body as a whole. Whether or not this will improve will depend on future evaluations.'' The employee had been injured for about á year and had a disability of only 15%. The employee's visit to Dr. Murphy was more than six months after the injury occurred and the doctor was promptly notified that the employee was not authorized to engage the doctor's services and that he must not look to the employer for his fee.

Following the visit to Dr. Murphy on August 8, the employee went to Drs. Kuhl and Kuhl, chiropractors, on August 18, 1961. During all this time the employee was working daily. After his fourth visit to Dr. Nixon over a period of about 10 months, the doctor recommended that he be referred to Drs. Watson, Adametz & Porter, neurosurgeons. On October 18, the employee went to see Dr. Hundley, an eminent orthopedic surgeon, who recognized at once that the man had disc trouble and that an operation might be necessary, but thought it advisable to first try conservative treatment. Just 12 days later, at a time when the employee had led Dr. Hundley to believe he was improving with the conservative treatment, he went to see Dr. Murphy, who performed an operation the very next day.

If the employer is liable for Dr. Murphy's fee for operating on the employee, such liability must be based on Ark. Stat. Ann. § 81-1311 (Repl. 1960) which provides: ''The employer shall promptly provide for an injured employee such medical, surgical, hospital and nursing service, and medicine, crutches, artificial limbs and other apparatus as may be necessary during the period of six [6] months after the injury, or for such time in excess thereof as the Commission, in its discretion, may require. If the employer fails to provide the services or things mentioned in the foregoing sentence within a reasonable time after knowledge of the injury, the Commission may direct that the injured employee obtain such service or

thing at the expense of the employer, and any emergency treatment afforded the injured employee shall be at the expense of the employer."

In my opinion, the above statute does not make the employer liable for Dr. Murphy's fee for the operation, and there is no other statute or law making the employer liable under the facts in this case. Before the employer would be liable for Dr. Murphy's fee for the operation, the treatment would have to be given within six months after the injury occurred, or such treatment must have been authorized by the Commission, or it must have been emergency treatment. None of these requirements existed. The treatment was not given within six months after the injury occurred; the treatment was not authorized by the Commission, and there was no emergency.

According to the undisputed evidence, the treatment did not occur within six months after the injury, and the Commission did not authorize it. That leaves the question of whether an emergency existed. The Commission held, in effect, that there was no emergency; there is more than substantial evidence to support that finding. The injury had occurred 14 months previously and the employee had worked every day for more than 13 months immediately preceding the operation.

It appears that the majority bases the decision in this case on a finding made by this court—not by the Workmen's Compensation Commission—that Dr. Murphy had correctly diagnosed the case and that Dr. Nixon and Dr. Hundley had made an incorrect diagnosis. Even if the record justified such a conclusion—and in my opinion it does not—under the law the employer would not be liable because the treatment was given more than six months after the injury occurred, the Commission did not authorize the treatment, and no emergency existed.

The record does not justify a finding that any of the doctors were mistaken in the diagnosis. The last time the employee saw Dr. Nixon was on October 6, 1961. The doctor suggested that he be transferred to Drs. Watson, Adametz & Porter for a neurological evaluation and

treatment. These doctors are neurosurgeons who perform disc operations. There is weighty medical authority to the effect that only neurosurgeons should do this type of operation. It is shown by evidence that the Veterans Administration will permit only neurosurgeons to do this operation, and this is also the policy of Campbell's Clinic, Mayo's Clinic, and Johns Hopkins Hospital.

Definitely, the record shows that Dr. Hundley did not incorrectly diagnose the case. In fact, Dr. Hundley stated in his diagnosis: ''It is felt that this patient very definitely presents organic evidence of an injury to his lower back which may consist of a mild herniation of the nucleus pulposus and certainly the great probability of this mildly degenerative disc at L5-S1. I have advised him to continue with his regular work, report daily for physical therapy and carry out the exercise in which he was instructed today.'' Dr. Hundley's diagnosis was made the first day he saw the man, October 18, 1961.

Of course no emergency was involved, the employee had been injured approximately 14 months before Dr. Hundley saw him, and furthermore, he was off from work for only a few days following the injury and had worked every day for more than 13 months at the time Dr. Hundley saw him. In these circumstances, the doctor thought conservative treatment was in order.

In Gray's Attorneys' Textbook of Medicine, Vol. 1, Page 304, in speaking of herniated nucleus pulposus (intervertebral disc) it is said: ''Love (22) concludes all such diagnostic procedures and operations for removal of a nucleus pulposus to be of major significance. He recommends against operations except in cases of long standing with major symptoms, such as those who have spent perhaps six months in bed. Barr, Hampton and Mixter (14) point out that visualization by x-ray is an exacting procedure. They insist that treatment for sciatica should long be attempted before resorting to operation.''

Perhaps the majority opinion holding the employer liable for the surgeon's fee is based entirely on the theory that Dr. Hundley had diagnosed the case as being

one of a herniated disc, but when the operation was performed an extruded disc was found. For all practical purposes, where the condition of the disc is causing trouble there is no valid distinction between an extruded disc, a ruptured disc, and a degenerated disc. Prior to the operation the doctors do not appear to have laid any stress on the distinction. Even after the operation Dr. Murphy used all three terms in describing the employee's condition. In a letter written by him to the insurance carrier regarding the employee following the operation, Dr. Murphy said: "The following morning surgery was done. An *extruded* disc was noted at this level. . . . I have conscientiously examined him, diagnosed his condition as a *herniated* disc, confirmed this with a myelogram, and rendered what I regard as competent treatment." (our emphasis). In his testimony Dr. Murphy stated: "Now disc problems are not static. They are dynamic. There is a constant changing, depending upon whether or not the disc *deterioration* or *degeneration* continues to take place or remains static. Here we have an excellent example of injury caused by a known accident, causing the *degeneration* . . ." (our emphasis).

The distinction between an extruded, herniated, or degenerated disc appears to be a nice perception seized upon after the operation to make it appear that qualified orthopedic surgeons furnished by the employer had not correctly diagnosed the case. Just because appellee voluntarily furnished able and competent doctors after the six month period does not mean that the employee was at liberty to engage at the employer's expense, a doctor unacceptable to the employer; one who had been notified that the employer would not pay his fee.

I might add that there is no question about the right of the employee to select his own doctor. Of course he has such a right, but there is no law that gives him the right to engage a surgeon to perform an expensive operation more than six months after the injury solely on his own initiative, and require his employer to pay the bill.

For the reason that I do not believe the law requires the employer to pay the surgeon's fee in the circumstances of this case, I respectfully dissent.