**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: 2013-NMCA-085

Filing Date: May 20, 2013

Docket No. 31,454

MICHELLE RUIZ,

        Worker-Appellant/Cross-Appellee,

v.

LOS LUNAS PUBLIC SCHOOLS
and NEW MEXICO PUBLIC SCHOOLS
INSURANCE AUTHORITY,

        Employer/Insurer-Appellees/Cross-Appellants.

**APPEAL FROM THE WORKERS' COMPENSATION ADMINISTRATION**
**Gregory D. Griego, Workers' Compensation Judge**

Law Office of Mel B. O'Reilly, LLC
Mel B. O'Reilly
Albuquerque, NM

for Appellant

Maestas & Sugett, P.C.
Paul Maestas
Albuquerque, NM

for Appellees

**OPINION**

**VIGIL, Judge.**

**{1}**    Worker's motion for rehearing is granted. The memorandum opinion filed in this case on March 26, 2013, is hereby withdrawn, and this Opinion is substituted in its place.

**{2}**    In this workers' compensation case, Worker appeals and Employer cross-appeals from two compensation orders entered by the workers' compensation judge following a trial

1

on the merits. For the reasons set forth below, we affirm in part and reverse in part.

**BACKGROUND**

**{3}**     Worker was working as a school bus driver with the Los Lunas Public Schools (Employer) when she injured her back and shoulder on October 8, 2007. Following a formal hearing, the workers' compensation judge (WCJ) determined that Worker's average weekly wage (AWW) was $270.30; that she had failed to perform a prescribed home exercise program during her recovery and this failure constituted an injurious practice supporting a reduction of her impairment rating by one percent; that Worker's unreasonable refusal of Employer's job offers rendered her ineligible for temporary total disability (TTD) benefits and modified permanent partial disability (PPD) benefits; and that Worker's residual physical capacity was light duty. Following a hearing on Worker's attorney fees, the WCJ found that Employer's offer of compensation was untimely, and Employer was ordered to pay fifty percent of Worker's attorney fees. Additional pertinent facts are discussed as they relate to the issues below.

**ISSUES**

**{4}**     On appeal, Worker contends the WCJ erred when it:  (1) included wages from the 2006-2007 school year in determining Worker's AWW; (2) found that Worker had persisted in an injurious practice by not following a home exercise program and reduced Worker's impairment rating by one percent; (3) denied Worker's TTD benefits and PPD modifier benefits due to her rejection of job offers; and (4) classified Worker's residual physical capacity as light duty when there was evidence she was unable to push or pull with her arms. In its cross-appeal, Employer argues the WCJ erred by:  (1) reducing Worker's impairment rating by one percent for her injurious practice because the evidence supports a reduction of no less than five percent; and (2) ordering Employer to pay fifty percent of Worker's attorney fees because Employer had made a valid offer of compensation prior to the start of trial.

**STANDARD OF REVIEW**

**{5}**     "We review workers' compensation orders using the whole record standard of review." *Leonard v. Payday Prof'l*, 2007-NMCA-128, ¶ 10, 142 N.M. 605, 168 P.3d 177. "In applying whole record review, this Court reviews both favorable and unfavorable evidence to determine whether there is evidence that a reasonable mind could accept as adequate to support the conclusions reached by the fact finder." *Levario v. Ysidro Villareal Labor Agency*, 120 N.M. 734, 737, 906 P.2d 266, 269 (Ct. App. 1995). "Under whole record review, the court views the evidence in the light most favorable to the agency decision, but may not view favorable evidence with total disregard to contravening evidence." *Tallman v. ABF (Arkansas Best Freight)*, 108 N.M. 124, 128, 767 P.2d 363, 367 (Ct. App. 1988) (citations omitted), *holding modified on other grounds by Delgado v. Phelps Dodge Chino, Inc.*, 2001-NMSC-034, 131 N.M. 272, 34 P.3d 1148. We review the WCJ's application of

2

the law to the facts de novo. *Tom Growney Equip. Co. v. Jouett*, 2005-NMSC-015, ¶ 13, 137 N.M. 497, 113 P.3d 320.

**DISCUSSION**

**I.      Worker's Average Weekly Wage**

**{6}** Worker begins by challenging the calculation of her AWW pursuant to NMSA 1978, Section 52-1-20(B) (1990), on the basis of the employment contracts she entered into at the start of each school year. Under the terms of her contract, Worker was hired to drive a school bus for approximately forty weeks between August and May, with her pay distributed to her over the course of fifty-two weeks. If Worker was hired to drive in June and July, the parties entered into a separate employment contract.

**{7}** The WCJ determined that "Worker's wage can be fairly calculated under Section 52-1-20(B). Wages paid from April 6, 2007 to October 5, 2007 (182 days) total $7,027.86 divided by 26 equals $270.30." Worker contends that the WCJ should have calculated her AWW under Section 52-1-20(B)(1) because a new period of employment began in August 2007 under the terms of her contract, and because she was not offered work in June and July 2007. Worker alternatively argues that this Court should calculate her AWW pursuant to Section 52-1-20(C) because the calculation methods provided under either Section 52-1-20(B) or Section 52-1-20(B)(1) result in an unrealistic calculation. Employer contends that the WCJ correctly applied the plain language of Section 52-1-20(B) after determining that Worker had been paid by the school district for the twenty-six weeks preceding her injury. We agree with Employer.

**{8}** Under Section 52-1-20(B), a worker's "average weekly wage shall be determined by computing the total wages paid to the worker during the twenty-six weeks immediately preceding the date of injury and dividing by twenty-six." *Id.* "[I]f the worker worked less than twenty-six weeks in the employment in which the worker was injured, the average weekly wage shall be based upon the total wage earned by the worker in the employment in which the worker was injured, divided by the total number of weeks actually worked in that employment." Section 52-1-20(B)(1). "[I]n any case where the foregoing methods of computing the average weekly wage of the employee . . . will not fairly compute the average weekly wage, in each particular case, computation of the average weekly wage of the employee in such other manner and by such other method as will be based upon the facts presented [to] fairly determine such employee's average weekly wage." Section 52-1-20(C).

**{9}** Under the terms of her employment contract, Worker was paid over a fifty-two week calendar year for approximately forty weeks of actual work. Therefore, even though Worker was not offered work as a bus driver in June and July, her payroll records indicate that she continually received wages for her work from the 2006-2007 school year during this time. The plain language of Section 52-1-20(B) specifies that a worker's AWW is calculated by examining "the total wages paid to the worker during the twenty-six weeks immediately

3

preceding the date of injury," indicating that our focus is on the wages earned by Worker, not whether she was actually working during this time. Because Worker's payroll records indicate that she did receive wages over the course of the twenty-six weeks preceding her injury, we find that the WCJ's AWW calculation under Section 52-1-20(B) was appropriate. *See Vinyard v. Palo Alto, Inc.*, 2013-NMCA-001, ¶ 16, 293 P.3d 191 (illustrating the propriety of adhering to the methodology set forth in Section 52-1-20(B) where a fair computation results).

**{10}** Worker contends that Section 52-1-20(B) is inapplicable because the terms of her contract and the fact that she did not work during the summer months preceding her injury establish that she had not worked for twenty-six weeks in the employment. We disagree. The contract for the 2007-2008 school year between Worker and Employer states that Worker is "a non-certified employee with three or more consecutive years of employment with the School District" and neither party disputes that Worker had worked as a bus driver for Employer for seven consecutive school years prior to her injury. Additionally, the fact that Worker did not work during the two summer months in June and July preceding her injury, is not sufficient evidence by itself to constitute a new employment. *See Villanueva v. Sunday Sch. Bd.*, 121 N.M. 98, 102, 908 P.2d 791, 795 (Ct. App. 1995) (finding that a seasonal worker who had not worked for approximately five months during the winter preceding her injury did not conclusively establish that a new period of employment had begun for purposes of an AWW calculation).

**{11}** Finally, Worker requests this Court to consider an alternative AWW calculation pursuant to Section 52-1-20(C) due to the fact that the 2007-2008 contract was a recent change in Worker's circumstances. In reviewing Worker's payroll records, we find no substantial shift in her wages earned during the 2006-2007 and 2007-2008 school years and Worker makes no argument to explain any effect that the most recent contract had on her wages. *See Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076 ("We will not review unclear arguments, or guess at what [a party's] arguments might be."). Further, there is no reason to resort to a Section 52-1-20(C) calculation as the WCJ's calculation under Section 52-1-20(B) resulted in a fair and accurate AWW for Worker.

## II.      Worker's Home Exercise Program

**{12}** A home exercise program appears to have been an anticipated part of Worker's therapy. Worker's initial referral for physical therapy specified the need for a home exercise program as part of her rehabilitation. Notations from her various visits with her physical therapists indicate that implementing a home exercise program was planned. However, a note from her physical therapist states that "[Worker] reports she has not been performing any [home exercise program], reports she has not received any home therapy." There is no indication that Worker's doctors or physical therapists ever implemented the planned program by prescribing specific home exercises for Worker to perform during her recovery.

4

**{13}** There is also evidence that two independent evaluators recommended that Worker perform a home exercise program to improve her recovery. The first recommendation came from MaryBeth Plummer, who commented that "[Worker] has not worked for two years and three months; therefore, performing range of motion and mild strengthening exercises may be beneficial for her and could be performed with Thera-Band and light weights at home after proper instruction." Ms. Plummer was a physical therapist who examined Worker for purposes of a functional capacity evaluation (FCE) on January 4, 2010, and wrote her report because "[Worker] is approaching maximum medical improvement [(MMI)] regarding her work-related shoulder and cervical injuries and permanent lifting restrictions need to be established."

**{14}** The other recommendation came from Dr. Juliana Garcia, who stated in her independent medical examination (IME) report that "[Worker] reports that she is not performing a home exercise program daily and only performs it once per month . . . . I recommend a home-based, self-directed exercise program. [Worker] should be participating in a daily home-based exercise regimen which includes components directed toward strengthening, stretching, flexibility, aerobic and cardiovascular condition." However, the IME report was created for litigation, it is addressed only to the attorneys for the parties, and it does not appear that either Worker or her treating physicians received a copy. Further, the report specifically states that the "[m]edical recommendations are offered or provided as guidance and not as medical orders. The opinions expressed do not constitute a recommendation that specific claims or administrative functions be made or enforced."

**{15}** Worker challenges the WCJ's determination that "Worker has persisted in an injurious practice which has increased Worker's disability or retarded Worker's recovery from injury. The practice is failure to follow the home exercise plan." Worker contends that she was never prescribed to perform a specific home exercise program by her health care professionals. On cross-appeal, Employer argues that the WCJ correctly found Worker had persisted in an injurious practice, but erred in reducing Worker's impairment rating by only one percent because the evidence supports a reduction of at least five percent.

**{16}** Under NMSA 1978, Section 52-1-51(I) (2005), "[i]f any worker persists in any unsanitary or injurious practice that tends to imperil, retard or impair the worker's recovery or increase the worker's disability . . . , the workers' compensation judge may in the judge's discretion reduce or suspend the workers' compensation benefits." To "persist in any injurious practice" means "that a workman must, as a matter of habit, go on resolutely or stubbornly in spite of opposition, importunity or warning, to inflict or tend to inflict injury to himself." *Martinez v. Zia Co.*, 99 N.M. 80, 82, 653 P.2d 1226, 1228 (Ct. App. 1982) (internal quotation marks omitted).

**{17}** While we agree with Employer that the evidence establishes that Worker never did home exercises, nothing in the record establishes that Worker was ever prescribed a specific home exercise program by any of her health care professionals. As Worker was never instructed to perform any specific exercises, she could not have acted "in spite of opposition,

importunity or warning." *Id.* Thus, we conclude the WCJ erred in finding Worker had persisted in an injurious practice. *See id.* (reversing a finding that the worker had persisted in an injurious practice after being informed by his doctors that he "should lose this excess weight" due to the district court's lack of findings regarding what actions the worker had done, or not done, that constituted an injurious practice). Consequently, we need not address Employer's cross-appeal regarding the percentage of benefits to be reduced as a result of the WCJ's findings of Worker's injurious practices.

### III. Employer's Job Offers

**{18}** On January 9, 2008, Dr. Ross released Worker to return to work under a light level of duty, limiting her to "[l]ifting [twenty] pounds maximum with frequent lifting and/or carrying objects weighing up to [ten] pounds" and noting that she "[m]ay return to driving [a] bus." After receiving notification of her release to return to work, Employer offered Worker her former bus driver position with a twenty-pound lifting restriction, which she refused on January 17, 2008, due to her concerns with driving a school bus while on her prescribed mediation. Employer then made a second job offer for a crossing guard position, which Worker also refused, citing pain in her shoulder. Two weeks after Worker refused the offers, Dr. Ross ordered an MRI due to Worker's continuing shoulder pain. Based on the results of the MRI, Dr. Franco diagnosed Worker with a torn rotator cuff, put Worker off work once again, and scheduled her for surgery. Concluding that Worker had unreasonably refused Employer's job offers, the WCJ denied TTD benefits after the date of the offers pursuant to NMSA 1978, Section 52-1-25.1(B)(1) (2005), and denied the modifier portion of Worker's PPD benefits pursuant to NMSA 1978, Section 52-1-26(D) (1990). We address each in turn.

### a. Worker's Temporary Total Disability Benefits

**{19}** TTD is "the inability of a worker, by reason of accidental injury arising out of and in the course of the worker's employment, to perform the duties of that employment prior to the date of the worker's [MMI]." Section 52-1-25.1(A). Therefore, "[i]f, prior to the date of [MMI], an injured worker's health care provider releases the worker to return to work, the worker is not entitled to [TTD] benefits if . . . the employer offers work at the worker's preinjury wage." Section 52-1-25.1(B)(1).

**{20}** Worker asserts that she remained eligible for TTD benefits throughout her recovery because "TTD means the inability of the [w]orker, by reason of accidental injury . . . to perform the duties of that employment prior to the date of [the] worker's MMI" and that "her injury and medication caused her to be unable to work" even after her doctor released her to return to work. Worker also challenges the release to work itself on the basis that Dr. Ross did not have all the relevant information necessary to make that determination. *See Sanchez v. Zanio's Foods, Inc.*, 2005-NMCA-134, ¶ 14, 138 N.M. 555, 123 P.3d 788 (citing *Niederstadt v. Ancho Rico Consol. Mines*, 88 N.M. 48, 536 P.2d 1104 (Ct. App. 1975) (holding that a doctor's report cannot serve as the basis for establishing causation of an

alleged work-related injury when the doctor lacked knowledge of an earlier unrelated incident in which the worker had injured himself)). Employer argues that the WCJ correctly denied TTD benefits because Employer offered Worker two jobs at her preinjury wage and that Worker's views regarding her ability to perform the offered positions are irrelevant under the language of the statute. We agree with Worker.

**{21}** "Section 52-1-25.1 applies so long as the worker is offered the position, even if the worker does not accept and become rehired." *Jeffrey v. Hays Plumbing & Heating*, 118 N.M. 60, 63, 878 P.2d 1009, 1012 (Ct. App. 1994). "If a worker can return to work and earn the same wage he was earning prior to his injury, there is no reason for him to receive temporary disability benefits." *Garcia v. Borden, Inc.*, 115 N.M. 486, 492-93, 853 P.2d 737, 743-44 (Ct. App. 1993). However, "the [L]egislature intended that where a worker is given a release to return to work, the release anticipates that the worker return to the type of work he was doing prior to the accident or work which he or she is otherwise physically capable of performing." *Id.* at 493, 853 P.2d at 744. The language of the Workers' Compensation Act (WCA) does not establish "that [the e]mployer can offer any work that has the same pre-injury wage, and thereby make [the w]orker ineligible to receive disability benefits, even though [the w]orker is unable to perform the work." *Id.*; *see also* 4 Arthur Larson & Lex. K. Larson, *Larson's Workers' Compensation* § 85.01, at 85-3 (2012) ("[I]n order for there to be a refusal of suitable employment on the part of the employee, a specific position, within the employee's medical limitations, must exist in fact, not just in theory." (footnote omitted)).

**{22}** Worker's rejection of the job offers was based on her inability to perform the offered work as demonstrated by the results of the MRI and Dr. Franco's diagnosis. Although Worker was released to return to work on January 9, 2008, by Dr. Ross, medical testing later established that this release was premature and that Worker was in fact unable to return to work at the time Employer made its job offers. We recognize that Employer properly relied on the release to return to work in making the offers. However, we cannot disregard that requiring Worker to accept employment under the circumstances before us would have run the substantial risk of further injury to Worker's shoulder, contrary to the WCA. *See* NMSA 1978, § 52-1-50.1(A)(1) (1990) (requiring an employer to rehire an injured worker, provided that "the worker's treating health care provider certifies that the worker is fit to carry out the pre-injury job or modified work similar to the pre-injury job without significant risk of reinjury"). Thus, we agree with Worker that she remained entitled to TTD benefits throughout her recovery.

**{23}** The result we reach does not give an employee a right to contravene her attending physician's determination that she is ready to return to her job duties. Worker refused the job offers by Employer at her own peril. However, because subsequent evidence established that Dr. Ross's release was premature and that Worker was in fact unable to return to work, Worker remained eligible for TTD benefits. *See Caldwell v. Joseph W. Vestal & Son, Inc.*, 371 S.W.2d 836, 838-39 (1963) (holding an employer liable for the cost of a worker's surgery when the recommendation for the procedure by the worker's physician later turned

7

out to be the correct treatment despite a contrary diagnosis from the employer's physician); *compare In re Porter v. Triborough Bridge & Tunnel Auth.*, 888 N.Y.S.2d 288, 289 (N.Y. App. Div. 2009) (finding that a worker had voluntarily removed himself from the workforce when he rejected his employer's job offer for work that he was capable of performing, as established by evidence despite his testimony to the contrary). Therefore, we reverse the denial of TTD benefits to Worker.

**b.       Worker's Permanent Partial Disability Modifications**

**{24}**    Section 52-1-26(D) states, "[i]f, on or after the date of [MMI], an injured worker returns to work at a wage equal to or greater than the worker's pre-injury wage, the worker's permanent partial disability rating shall be equal to his impairment and shall not be subject to the modifications calculated." *Id.* Permitting a worker to evade application of this section by voluntary unemployment or underemployment is contrary to the purposes of the WCA. *Jeffrey*, 118 N.M. at 64, 878 P.2d at 1013. Thus, a worker becomes ineligible for modifier benefits pursuant to Section 52-1-26(D) when either the worker accepts employment at or above his preinjury wage or unreasonably refuses offered employment at or above his preinjury wage. *Cordova v. KSL-Union*, 2012-NMCA-083, ¶ 13, 285 P.3d 686, *cert. denied*, 2012-NMCERT-007, 295 P.3d 599.

**{25}**    Similar to her challenge to the denial of TTD benefits, Worker contends that application of Section 52-1-26(D) was improper here as she "was unable to work because of her injury" and that she "should not be penalized for protecting her health, the safety of children while on medication, or avoiding further injury to herself when her shoulder injury was not properly diagnosed and caused her severe pain." Employer argues that the WCJ correctly denied the modifier portion of her PPD benefits after finding that "Worker would have been earning a wage equal to or greater than her pre-injury wage after [MMI] had she accepted the Employer's light/modified duty job offers." We conclude that Section 52-1-26(D) is inapplicable here.

**{26}**    As already discussed, the results of the MRI and Dr. Franco's diagnosis established that Worker was unable to perform either the offered bus driver position or the crossing guard position. Because she was unable to perform either job, these offers by Employer cannot be applied to render Worker ineligible for workers' compensation benefits. *See Garcia*, 115 N.M. at 493, 853 P.2d at 744 (stating that the WCA does not establish "that [the e]mployer can offer any work that has the same preinjury wage, and thereby make [the w]orker ineligible to receive disability benefits, even though [the w]orker is unable to perform the work"). Because Employer made no further job offers to Worker following her surgery, application of Section 52-1-26(D) is inappropriate here. Therefore, we reverse the order of the WCJ denying Worker the modifier portion of her PPD benefits.

**IV.       Worker's Residual Physical Capacity**

**{27}**    Worker argues that the WCJ erroneously classified her residual physical capacity as

8

light because she is unable to push or pull with her arms, contrary to the requirements under NMSA 1978, Section 52-1-26.4 (2003). Under Section 52-1-26.4(C)(3), a light physical capacity determination

> means the ability to lift up to twenty pounds occasionally or up to ten pounds frequently. Even though the weight lifted may be only a negligible amount, a job is in this category when it requires walking or standing to a significant degree or when it involves sitting most of the time with a degree of pushing and pulling of arm or leg controls or both.

A sedentary physical capacity determination "means the ability to lift up to ten pounds occasionally or up to five pounds frequently." Section 52-1-26.4(C)(4).

**{28}** We find no error in the WCJ's finding that Worker's residual physical capacity was light duty. The WCJ heard evidence that Worker had been released to work twice in a light duty capacity by her treating physicians. The two independent medical examiners also agreed that Worker's abilities were consistent with a light duty designation. Despite this evidence, Worker points out a few lines of deposition testimony from Dr. Garcia as conclusive proof of her inability to push and pull with her hands. However, in this same testimony, Dr. Garcia assigned Worker a light duty classification, noted certain inconsistencies with Worker's use of her hands during her evaluation, and stated that she did not believe that these inconsistencies were a true representation of Worker's capacities. We conclude that the record supports the WCJ's determination regarding Worker's residual physical capacity. *See generally Garnsey v. Concrete Inc. of Hobbs*, 1996-NMCA-081, ¶ 20, 122 N.M. 195, 922 P.2d 577 ("It is the duty of the fact-finder to weigh the evidence and resolve any conflicts.").

## V.     Employer's Offer of Compensation Order

**{29}** Lastly, we address Employer's cross-appeal regarding the award of Worker's attorney fees. Trial was originally scheduled for March 28, 2011. However, the proceeding held on that date focused on Worker's motion to compel discovery, and the trial was rescheduled for April 27, 2011. On April 15, 2011, Employer made an offer of compensation to Worker, which Worker did not respond to. Trial was then held on April 27, 2011. During a hearing on Worker's attorney fees, Employer requested the WCJ to apply NMSA 1978, Section 52-1-54(F)(3) (2003), but the WCJ refused, finding that Employer had made an untimely offer of compensation after the start of trial on March 28, 2011. Employer challenges this finding, arguing that the facts do not establish that trial commenced on March 28, 2011, but rather on April 27, 2011, making its April 15, 2011 offer timely under Section 52-1-54(F). We agree with Employer.

**{30}** Section 52-1-54(F) states that "[a]fter a recommended resolution has been issued and rejected, but more than ten days before a trial begins, the employer or claimant may serve upon the opposing party an offer to allow a compensation order to be taken against him[.]"

9

Section 52-1-54(F)(3) then provides: "[I]f the employer's offer was greater than the amount awarded by the compensation order, the employer shall not be liable for his fifty percent share of the attorney fees to be paid the worker's attorney and the worker shall pay one hundred percent of the attorney fees due to the worker's attorney." Otherwise, "the payment of a claimant's attorney fees . . . shall be shared equally by the worker and the employer." Section 52-1-54(J).

**{31}** We agree with Employer that the facts do not support a finding that trial began on March 28, 2011. On that date, the WCJ began by asking if the parties had "[a]ny preliminary matters prior to the presentation of evidence or opening statement requiring attention." Worker notified the WCJ of her pending motion to compel discovery from Employer and arguments were heard from both parties. After granting the motion and ordering Employer to send its responses to the interrogatories to Worker within fourteen days, a new trial date was set and the hearing was adjourned. No opening statements were made, no evidence was presented, no witnesses were sworn in or gave testimony, and the depositions and exhibits that had been submitted to the WCJ prior to the start of the proceedings were returned to the parties. During the approximately eleven-minute hearing, the WCJ stated that "[w]e're not going to go to trial today," they would find "the first available trial date" to reschedule, and "this case has been rescheduled for purposes of trial on April 27." Lastly, the WCJ filed a written order granting Worker's motion to compel following the March 28, 2011 hearing, which noted that "[t]his matter is continued for Trial on April 27, 2011."

**{32}** In light of the foregoing, we conclude that the WCJ erred in finding that trial began on March 28, 2011. *See Black's Law Dictionary* 1644 (9th ed. 2009) (defining a trial as "[a] formal judicial examination of evidence and determination of legal claims in an adversary proceeding"). A trial on the merits is "[a] trial on the substantive issues of a case, as opposed to a motion hearing or interlocutory matter." *Id.* at 1645; *compare Willcox v. United Nuclear Homestake Sapin Co.*, 83 N.M. 73, 75, 488 P.2d 123, 125 (Ct. App. 1971) (finding that an employer's offer for compensation was untimely under an earlier version of Section 52-1-54(F) because it was not made thirty days prior to when the trial took place). Thus, we reverse the WCJ's order requiring Employer to pay fifty percent of Worker's attorney fees.

**CONCLUSION**

**{33}** We remand for recalculation of Worker's compensation benefits and entry of a compensation order in conformity with this Opinion.

**{34}    IT IS SO ORDERED.**

_____
**MICHAEL E. VIGIL, Judge**

**WE CONCUR:**

_____

**RODERICK T. KENNEDY, Chief Judge**


_____

**CYNTHIA A. FRY, Judge**


**Topic Index for *Ruiz v. Los Lunas Pub. Sch.*, No. 31,454**


**APPEAL AND ERROR**
Standard of Review


**WORKERS' COMPENSATION**
Attorney Fees
Disability, Partial
Medical Treatment
Modification or Termination of Benefits
Rate of Compensation
Workers' Compensation, General